329 F.2d 836
 VIRGINIA NATIONAL BANK (formerly known as Peoples National Bank of Charlottesville, and also formerly known as Peoples National Bank of Central Virginia), Appellant,
v.
B. B. WOODSON, Trustee in Bankruptcy, Appellee.
In the Matters of Sterling R. DECKER, Bankrupt, In Bankruptcy, No. 706, and Sterling R. Decker and Mary Jane Decker, Partners, t/a Berkeley Community Builders, Bankrupts, In Bankruptcy, No. 707.
 No. 9108.
 United States Court of Appeals Fourth Circuit.
 Argued November 8, 1963.
 Decided March 31, 1964.
 
 Atwell W. Somerville, Orange, Va. (Somerville & Moore, Orange, Va., on brief), for appellant.
 William S. Aaron, Jr., Charlottesville, Va. (Walker, Woodson & Aaron, Charlottesville, Va., on brief), for appellee.
 Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.
 BOREMAN, Circuit Judge.
 
 
 1
 This appeal stems from a decision of the District Court with respect to a transfer of property by a bankrupt alleged as preferential under the provisions of Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96.
 
 
 Facts
 
 
 2
 Pursuant to a petition filed by his creditors on December 11, 1961, Sterling R. Decker was adjudicated an involuntary bankrupt. At or about the same time, involuntary petitions were filed against Sterling R. Decker and Mary Jane Decker, partners trading as Berkeley Community Builders, who were thereafter adjudicated bankrupts. On June 11, 1962, B. B. Woodson, the duly appointed Trustee of the bankrupt estates, filed his petition before the Referee attacking as preferential a payment of $8,000 by Sterling R. Decker's sister, Vivian A. Decker, to The Peoples National Bank of Charlottesville, the predecessor of Virginia National Bank.
 
 
 3
 In 1957 Decker and several others had purchased a tract of land in Albemarle County, Virginia, which was developed by them as a residential subdivision under the name of Berkeley Community. In early 1961 Decker constructed a swimming pool on a portion of the land in Berkeley Community, the purpose of the swimming pool being to enhance the desirability of Berkeley Community as a residential subdivision. A nonprofit corporation, known as the Berkeley Community Swimming Pool Corporation, was formed for the purpose of operating the swimming pool. Article IV of the Corporation's Articles of Incorporation reads as follows:
 
 
 4
 "The membership of the corporation shall consist of two classes, resident members and seasonal non resident members; the former shall be those persons resident in Berkeley Community who are in good standing in the Corporation, as shown by the records, minutes and By-laws of the corporation. Swimming pool privileges shall accrue to each resident member's family. The total amount of memberships shall not exceed eighty (80). Seasonal non resident memberships may be authorized by a majority vote of the resident members in an amount not to exceed the number unsubscribed resident membership, but at no time will the total amount of resident memberships and seasonal non resident memberships exceed eighty (80). Resident members of the corporation shall receive certificates of membership, which shall entitle them to all of the privileges of the corporation, but which shall not entitle them to any financial profits of any type, and which, in case the member shall resign or have his membership terminated in accordance with any of the By-laws of the corporation, shall become null and void."
 
 
 5
 The fee for membership in the swimming pool corporation was fixed at $200.00 per person. As a consideration for the services rendered by Decker in the construction of the swimming pool and to reimburse him for expenditures of his own funds in such construction, the corporation gave Decker the right to initially designate new members; for each such designee subsequently accepted by the corporation as a member, Decker was to receive the $200.00 membership fee.
 
 
 6
 For a number of months prior to November 10, 1961, the bank accounts of the bankrupts at the Bank had been substantially overdrawn. As of November 8, 1961, the overdraft in the account of Mary Jane Decker was $35.72 and the overdraft of Sterling R. Decker or Mary Jane Decker was $582.89; and as of November 10, 1961, the overdraft in the account of the partnership, Berkeley Community Builders, was $8,877.90. There is evidence to support the inference that these overdrafts were the result of Decker's connivance with a bank employee. After officials of the bank discovered the overdrafts Decker was pressed for payment. The Referee found that the possibility of criminal prosecution against both Decker and the involved bank employee was mentioned, but whether to Decker or not is not clear from the evidence. Decker had exhausted all sources for borrowing funds. In desperation he turned to his sister, Vivian A. Decker, who lived in Florida, for assistance in covering the overdrafts.
 
 
 7
 The Referee found that "the possibility of criminal prosecution is one of the levers employed by Decker to prevail upon his sister to make the loan to him." Vivian Decker was reluctant to advance any money but the record is clear that Decker promised to give his sister an assignment of forty-five swimming pool shares or rights for a loan of $8,000.00, that being the maximum amount which she informed her brother she could raise. Miss Decker not having implicit faith that her brother would use the money to take care of the overdrafts had a telephone conversation with an attorney of Charlottesville, Virginia, arranged to send him $8,000.00 and instructed him to apply that amount on Decker's overdrafts at the bank "only if he raised sufficient other funds to cover the overdrafts."
 
 
 8
 On or about November 11, 1961, the Charlottesville attorney received from Vivian A. Decker a Western Union money order for $8,000.00 but on the same day Miss Decker arrived in Charlottesville from Florida and repossessed the money order. In accordance with instructions from Decker, the attorney had prepared an assignment to Vivian A. Decker of the swimming pool rights but had no independent knowledge as to whether the assignment was executed by Decker. On November 13, 1961, while sitting in a car parked near the bank, Vivian Decker delivered to an employee of The Peoples National Bank the Western Union money order for $8,000.00. This was the first contact had by any representative of the bank with Vivian Decker concerning this particular transaction and it does not appear that any inquiry was made by the bank employee at that time, or subsequently, as to the nature of the transaction between Decker and his sister. The Peoples National Bank used the $8,000.00 to pay the overdraft of $35.72 in the account of Mary Jane Decker, the overdraft of $582.89 in the account of Sterling R. Decker or Mary Jane Decker, and to reduce the overdraft in the partnership account by the sum of $7,381.39.
 
 
 9
 After Miss Decker's return to Florida, she received a promissory note in the amount of $8,000.00 dated November 10, 1961, executed by Decker and payable to her order on demand. This note was delivered to her personally by Decker's wife. On or about November 17, 1961, Miss Decker received through the mail a so-called Bill of Sale signed by Decker and acknowledged by him on November 10, 1961, which purported to sell, assign, set over and transfer unto Vivian Decker "all his right, title and interest in and to forty-five (45) shares (memberships) in the Berkeley Community Swimming Pool, Inc."
 
 
 10
 On February 13, 1962, Miss Decker filed in the bankruptcy proceeding a proof of claim and attached thereto a copy of the $8,000.00 note stating that she held no security for the payment of the debt. After she was called upon to testify as a witness, she filed an amended proof of claim which disclosed that she held the assigned swimming pool membership rights as security for a loan of $8,000.00 made by her to Decker.
 
 
 11
 It is clear that it was the intention of Vivian Decker that the $8,000.00 paid by her to the bank was to be applied toward satisfaction of an antecedent debt of Decker to the bank. Concededly the payment was made within the period of four months immediately prior to the filing of the bankruptcy petition and it is apparently undisputed that both the bank and Vivian A. Decker knew, or had reason to believe, that Decker was insolvent.
 
 
 12
 Upon these facts the Referee held that, under the provisions of section 60 of the Bankruptcy Act, the $8,000.00 payment by Vivian Decker to the bank constituted a voidable preferential transfer of assets to the bank and ordered the bank to pay over to the Trustee the sum of $8,000.00. On petition for review the District Court affirmed the Referee and the bank prosecutes this appeal.
 
 
 Discussion
 
 
 13
 In Aulick v. Largent, 295 F.2d 41 (4 Cir. 1961), this court held that a voidable preference to the holder of an antecedent debt of the bankrupt resulted where the debt was paid by a third party who, in turn, received security from the bankrupt. In the instant case the bankrupt, Decker, transferred assets (the shares or memberships in the swimming pool corporation) as a consideration or security for the payment by a third party, namely, Miss Decker, of the bank's antecedent debt.
 
 
 14
 The bank contends that the bankrupt estate was not actually diminished and the assets were not depleted by the transfer since the property transferred was, in fact, of no value. If this be so, an essential element of a voidable preferential transfer is lacking in that "the essence of a preference is that it depletes the bankrupt's estate available to remaining creditors." Ricotta v. Burns Coal & Building Supply Company, 264 F.2d 749, 751 (2 Cir. 1959). The Trustee counters by asserting that the shares or membership rights do have a value and that their transfer to the sister effectively depleted the bankrupt estate. Unfortunately, there is no evidence in the record and no finding below with respect to the value, if any, of the transferred property.
 
 
 15
 Assuming, however, that the "shares" do possess some actual value, it is clear that the bank received a voidable preference; but the question logically raised by this conclusion is as to the proper measure of the bank's liability to the Trustee and the bankrupt's estate. The statute provides that if the Trustee makes out a case of voidable preference, he is entitled to recover "the property or, if it has been converted, its value from any person who has received or converted such property."[1]
 
 
 16
 The court below ordered the bank to pay over the entire $8,000.00 it received from the sister, and the Trustee seeks to justify that result upon the theory that the payment by the sister to the bank was in effect a loan to the bankrupt; and that said payment depleted the bankrupt's estate and assets available to creditors by the amount thus received by the bank. This position is untenable. If an unconditional loan is made to a bankrupt, the loan proceeds become part of the bankrupt's free assets. See Smyth v. Kaufman, 114 F.2d 40, 43, 130 A.L.R. 951 (2 Cir. 1940). However, in the case at bar, it is clear from the evidence and the findings of fact that the payment of the $8,000.00 by Miss Decker was not an unconditional loan for the benefit of all creditors but was made for the specific purpose of paying at least a portion of a particular debt owed to the bank. As a general rule, such a payment, in and of itself and without more, will not create a voidable preference since there has been no diminution of the value of the estate.[2] A different result is indicated where the making of the loan, though for the purpose of paying a specific, unsecured creditor, results in a depletion of assets and diminution of the bankrupt's estate. We so held in Aulick v. Largent, 4 Cir., 295 F.2d 41.
 
 
 17
 In Aulick, no question was raised as to the value of the collateral pledged as security to the third party (Lemley) for his endorsement of bankrupt's note and assumption of liability for the payment of the antecedent unsecured debt of the creditor (Mrs. Aulick) who was held to have received a voidable preference. There the resulting depletion of bankrupt's assets was the same as though the collateral had been pledged directly with Mrs. Aulick to secure the payment of her antecedent debt. Circuity of the arrangements did not operate to save Mrs. Aulick from the application of the pertinent provisions of the Bankruptcy Act designed to prevent an insolvent from preferring one creditor over others of the same class.
 
 
 18
 In the instant case, the value of the swimming pool rights assigned to Miss Decker was brought into sharp focus by the disagreement of the parties but the question as to value remains un-answered. The fact that there was a preference which involved a depletion of the bankrupt's estate to some undisclosed extent does not necessarily require that the preferred creditor shall return all that he has received unless the amount of depletion is at least equal to the amount so received. The test is not what the creditor receives but what the bankrupt's estate has lost. It is the diminution of the bankrupt's estate, not the un-equal payment to creditors, which is the evil sought to be remedied by the avoidance of a preferential transfer. As was pointed out by the Supreme Court in Continental & Commercial Trust & Savings Bank v. Chicago Title & Trust Co., 229 U.S. 435, 444, 33 S.Ct. 829, 831, 57 L.Ed. 1268 (1913), "The fact that what was done worked to the benefit of the creditor, and in a sense gave him a preference, is not enough, unless the estate of the bankrupt was thereby diminished."
 
 
 19
 The Trustee has not undertaken to proceed against Vivian Decker and she has not been made a party to these proceedings. She holds the swimming pool rights by virtue of the assignment to her for which she furnished a fresh consideration of $8,000.00. She has filed her claim against the bankrupt's estate in the amount of $8,000.00 and any claims which the bank has or had have been reduced by that amount as a result of her payment to it. The bankrupt's liability to creditors has not been increased — it remains the same. The only prejudice to the bankrupt's estate and the rights of general creditors derives from the transfer out of the estate of an asset of undetermined value. If, as contended by the Trustee, the swimming pool shares or memberships assigned and transferred to Vivian Decker were actually of value to the bankrupt's estate, the bank received a voidable preference. Since the bank did not receive the shares and therefore cannot be required to surrender them to the Trustee, it should be required to pay to the Trustee the value thereof but, in no event, a sum exceeding the amount received by it from Miss Decker. The District Court should take whatever action is necessary to ascertain the value, if any, to the bankrupt's estate of the assigned and transferred property. The case is therefore remanded for further proceedings consistent with the views herein expressed.
 
 
 20
 Reversed and remanded for further proceedings.
 
 
 
 Notes:
 
 
 [1]
 Bankruptcy Act § 60, sub. b, 11 U.S.C.A. § 96, sub. b
 
 
 [2]
 Grubb v. General Contract Purchase Corporation, 94 F.2d 70 (2 Cir. 1938); In re Zaferis Bros. & Co., 67 F.2d 140 (9 Cir. 1933); In re Henry C. Reusch & Co., 44 F.Supp. 677 (D.N.J.1942). See also, Cheek v. Beverly-Wilshire Properties, 103 F.Supp. 913 (S.D.Cal.1952)