**E. D. SLOAN, Trustee in Bankruptcy for Fairmont Mobile Homes, Inc.,**
**Plaintiff,**

v.

**Blake P. GARRETT and David H. Garrett, trading and doing business as Garrett and Garrett, a partnership, Defendants.**

**C. A. No. 66–805.**

United States District Court
D. South Carolina,
Greenville Division.

Nov. 24, 1967.

Wyche, Burgess, Freeman & Parham, James C. Parham, Jr., Greenville, S. C., for plaintiff.

Younts, Reese & Cofield, Melvin K. Younts, Greenville, S. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER

DONALD RUSSELL, District Judge.

In compliance with Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

### FINDINGS OF FACT

1. The bankrupt Fairmont Mobile Homes, Inc. (hereinafter called "Fairmont") is a corporation chartered in early 1965 under the laws of South Carolina with an original capital and surplus account of $150,000.00. Prior to bankruptcy, it was engaged in the business of fabricating and selling mobile homes at a plant located in leased premises at Donaldson Air Base, near Greenville, South Carolina. The president was Charles D. Green but during the period involved herein he was largely inactive. Walter C. Abercrombie was its Secretary-Treasurer until his resignation on February 17, 1966. Hubert Wade became Comptroller January 1, 1966, and served as such until petition in bankruptcy was filed in early March, 1966. The plaintiff is the trustee in bankruptcy of Fairmont and brings this action as such.

2. The defendant Garrett and Garrett is a partnership composed of Blake P. Garrett and David H. Garrett, both residents of Greenville County, South Carolina, and as such is engaged in a general construction business in Fountain Inn, South Carolina.

3. Sometime about the middle of 1965, Fairmont contracted with Garrett and Garrett to construct on the former's leased premises a plant addition. The agreed contract price, payable on completion, was $7,875.00. Construction of the addition was completed November 19, 1965, and occupancy began at about that time.

4. When the addition was completed, Fairmont was unable to make payment as contracted. There was some suggestion by the bankrupt that the partnership might accept, at least in part payment, a mobile unit. The Garretts were not receptive to the idea, stating that "we were out of the trailer business, we weren't selling any, and we didn't need it." It was finally agreed that, after a cash payment of $1,840.00 on November 23, 1965, the balance of the contract price should be liquidated by monthly payments of $1,000.00, with interest. Monthly payments were accordingly made in December, 1965, and January 27, 1966. When each of these payments was made, it was suggested again that a mobile unit might be transferred in discharge of the debt but the partnership was not agreeable. At the time of the transfer assailed herein, the balance due on such contract was $4,035.60.

5. In February, David Garrett received a telephone call from one Rice, expressing an interest in purchasing a mobile unit and inquiring whether Garrett had one for sale. It might be remarked, parenthetically, that such inquiry was a natural one, since the Garretts had owned and operated a similar plant to that of the bankrupt up until about a year before. David Garrett immediately communicated with Fairmont and made arrangements to accept a mobile unit in satisfaction of the debt due the partnership. Such mobile unit was thereupon sold by the defendant to Rice. The voidance of this transfer is the issue posed by this suit filed by the trustee in bankruptcy.

6. There are two crucial dates on which the determination of the validity of the transfer largely turns. The *first* concerns the date on which the actual transfer from the bankrupt to the partnership occurred; the *second* is the date

on which the partnership became possessed of such facts as should have led the partnership to believe Fairmont insolvent. In connection with the latter issue, it seems fairly well recognized by the parties that such date was the occasion on which Blake Garrett, meeting with certain officers of Fairmont, viewed a balance sheet statement of the condition of Fairmont as of the end of January, 1966, prepared by Mr. Wade.

7. The plaintiff contends that the date of the transfer was February 15, 1966, that being the date on which certificate of origin was executed, and that the date on which Blake Garrett was made aware of facts sufficient to induce a belief of the Fairmont's insolvency was no later than February 12, 1966. The defendant fixes transfer as February 7 or 8, 1966, and date of reasonable cause to believe Fairmont insolvent on its part as February 19, 1966.

8. The testimony offered by the trustee on the date of transfer is not too clear. Mr. Abercrombie testified that, while he "may have talked with" Mr. David Garrett about the transfer of a coach to the partnership "on either February 7 or 8", he did not recall it at the time he testified, but he did recall that "in early February, of 1966, several transfers were proposed", and he was actually instructed by either Mr. Green or Mr. Moorhead (the president of the holding company which controlled the Fairmont) to transfer a coach to the defendant. He added that he "didn't transfer" the coach to the defendant. Mr. Wade, who executed the certificate of origin on February 15, did so at the direction of Mr. Moorhead and disclaimed any personal knowledge of the actual transfer itself. While neither Mr. Abercrombie nor Mr. Wade could fix a date for the delivery of the coach to the partnership, both testified that it was normal for delivery to be contemporaneous with the execution of the certificate of origin. From this, the trustee would argue that delivery would have been on February 15, the date of the preparation of the certificate of origin.

9. Over against this largely negative testimony by the trustee is the positive testimony of David Garrett that he talked to Mr. Abercrombie on February 7, made "a trade" with him at that time, and received delivery of the coach from Fairmont at the partnership's yard in Fountain Inn on the afternoon of February 7 or February 8. To some extent, this testimony was reinforced by Rice, the purchaser of the coach from the partnership. He fixed the date when he talked to Mr. Garrett about a coach as "very early in February, first week in February." Mr. Garrett advised him, after a short delay, that he had a coach such as Mr. Rice wanted and "within a few days of our (this) conversation" Mr. Rice inspected the coach at the yard of the partnership in Fountain Inn and "verbally traded" for it. Mr. David Garrett, incidentally, identified the date of such inspection as Thursday, February 10, which, of course, is consistent with Mr. Rice's testimony. In addition, Mr. Blake Garrett, on his return from the Bahamas on February 10, testified that he saw the coach on the yards of the partnership. Blake Garrett's brother, Charles Garrett, testified that he visited the yards of the partnership on February 11 or 12 and observed the coach in the yards.

10. The trustee urges that this direct testimony offered by the defendants to establish date of delivery should be disregarded because it would involve a delivery made contrary to the usual practice of Fairmont, which normally made delivery of coach contemporaneous with delivery of certificate of origin. However, Mr. Abercrombie's testimony to some extent indicates that delivery of the coach was to be made in advance of the preparation of a certificate of origin. He testified that "in early February" he was instructed, whether by Mr. Green or Mr. Moorhead not being clear, to transfer a coach to the defendants. It is true he testified that he did not make the transfer. But, at least from his testimony, his superiors were directing the delivery of a coach to the defendants in "early February" and there is no reason

to assume that such delivery was not made, as Mr. Garrett testified unequivocally that there was. Delay in the preparation of the certificate of origin in this case could well have arisen from the unusual confusion within Fairmont's own organization at the time. Mr. Abercrombie testified that he had misgivings about the transfers he was instructed to make. This would have explained his reply to the request which Mr. David Garrett testified he made for the issuance of a certificate of origin. According to Mr. Garrett, Mr. Abercrombie stated that due to some confusion there had been a delay in the delivery of the certificate. Actually, the preparation of the certificate was finally directed some days later by Mr. Moorhead, to whom the certificate was actually delivered by Mr. Wade. It was thereafter mailed to the defendants.

11. I find that, in performance of the agreement for the acceptance of the coach in payment of Fairmont's debt to the defendants, the coach involved in this proceeding was delivered to the defendants at their yard in Fountain Inn on February 7 or 8, 1966.

12. Turning to the second crucial date: It is apparent from the record that from the outset the financial affairs of Fairmont were conducted in a slip-shod manner. Mr. Wade, who joined Fairmont as Comptroller January 1, 1966, stated that he did not "find any of the books or the records or anything (of Fairmont) in order or in an orderly manner" when he assumed his duties. What profit-and-loss statements as were prepared were generally abbreviated, inaccurate and even contradictory and were "on a work-sheet basis". It would appear that no attempt at a balance-sheet statement of the financial conditions of Fairmont was made until Wade completed one sometime in February, 1966. As Mr. Wade testified, it was necessary for him "to bring these books (of Fairmont) into order before anything could accurately be determined."

13. For several months prior to bankruptcy, Fairmont was pressed for operating capital. It was unable, for instance, to pay the defendant-partnership when the latter's debt accrued. Thereafter, Fairmont was slow in meeting its monthly payments to the defendant-partnership. During much of this time, it was carrying an overdraft with its bank. The record indicates, however, that the real financial condition of the bankrupt was not recognized until after Wade presented his financial statement to the board of directors. Prior to that, it was felt that Fairmont's difficulties stemmed not from a want of solvency but from a want of adequate working capital; and, if such working capital could be secured, its operations would be profitable.

14. Sometime in February, the management of Fairmont enlisted the assistance of Blake Garrett in seeking either a new source of operating capital or an acceptable merger. Blake Garrett's interest apparently arose out of his friendship for Fairmont's management. He, also, had formerly been in the mobile-home business and had some acquaintance with others interested in such business. He testified that at no time prior to February 19, 1966, did he see or review or have at his disposal any financial statements or records of Fairmont.

15. He had visited the plant a time or two in January but, as Mr. Abercrombie explained these visits, "Mr. Green had approached Mr. Garrett for advice and asked him to come out and look over the operations as we had it, and see if he could make any suggestions as to how we could do it better." This request was prompted by the fact that "Mr. Garrett had at one time owned a mobile home plant, which had done quite well in Tennessee."

16. In an effort to secure additional working capital for Fairmont, Garrett sought a loan from the Palmetto Bank at Laurens, South Carolina, sometime in latter January or early February, 1966. Garrett testified that, prior to such loan application, discussion was had about a balance sheet of Fairmont and was told there was none available. Certain of the

directors of Fairmont *and Garrett* offered "to personally guarantee" any loan that the bank might make Fairmont "in lieu of a balance sheet." This occurred during a period of national credit stringency and the loan was denied, but the willingness of Garrett to guarantee personally such loan is strong confirmation that he had no reason to believe Fairmont insolvent.

17. There was, also, testimony, uncontradicted, that a number of parties were approached with reference to a merger or sale of Fairmont in January and February. It was thought that, through some form of a merger, or a sale of Fairmont "as a going concern", everyone, including the stockholders, would "get their money."

18. I find that, while this evidence indicates that at all times Fairmont was cramped by a shortage of working capital, there was not sufficient evidence to induce a reasonable belief that Fairmont was insolvent prior to the preparation by Mr. Wade of a financial statement of the bankrupt as of the close of the books for the period ending January 29, 1966. Until this time, the solvency of the company was believed by all concerned; and its real need was believed to be an increase in its working capital. When, however, Mr. Wade's financial statement was made available, all the officers of Fairmont and Mr. Blake Garrett (who reviewed such financial statement at a meeting of the directors of Fairmont which he attended) were in possession of knowledge of the insolvency of Fairmont. When such financial statement came to the knowledge of Mr. Blake Garrett is in controversy between the parties. The trustee contends that the meeting, at which the financial statement was seen by Mr. Garrett, occurred on February 12, 1966. The defendants would fix the date as February 19, 1966.

19. The trustee bases his position upon the fact that Mr. Abercrombie was present at the meeting, that his connection with the bankrupt terminated on or before February 17 and that he was no longer with the bankrupt after that date.

The meeting, thus, if Mr. Abercrombie was present, had to have occurred before February 17. The only meeting when the financial statement could have been taken up at a meeting attended by Abercrombie prior to February 17 was February 12.

20. On the other hand, Mr. Blake Garrett, who is not clear on whether Abercrombie was present at the meeting, fixes the meeting on the 19th of February. Mr. Moorhead supports generally Mr. Garrett in this. He testified that, as best he recalled it, he received the financial statement from Mr. Abercrombie on the night of the 17th, when Mr. Abercrombie's resignation was given him. About two days later, he reviewed this statement with Mr. Garrett and the directors of Fairmont.

21. It is not easy to resolve this issue. All the parties seemed to be giving their best recollections and I am sure are sincere in their opinions. Mr. Abercrombie was firm in his testimony that he presented this financial statement to the directors when Blake Garrett was meeting with them. He fixed the date as sometime before February 15. This testimony would necessarily place the meeting on February 12.

22. I have some difficulty with the date of February 19 for the meeting. In the first place, Abercrombie, according to all the testimony, brought this financial statement to the attention of the board. While his resignation is dated February 17, he actually ceased to take any part in the management a day or two before this. He had differed heatedly, apparently, with the directors and, in the words of Mr. Wade, "he was asked to relieve himself for a few days to cool off." Also, Moorhead arrives at February 19 as the proper date by reasoning from the date on which, as he recalls it, he received the statement from Abercrombie. He received such statement, according to his recollection, on the night of February 17 or 18 and accordingly first brought the statement to the attention of Mr. Blake Garrett on the 19th. But it would seem unlikely that Abercrombie would

**240**

have been around on the evening of either the 17th or 18th. It is much more reasonable to conclude from the record that he ceased to be at the offices of the bankrupt after the 15th, a conclusion that makes the February 12 date more reasonable. I, therefore, feel that February 12 should be accepted as the date for the meeting at which Blake Garrett, as well as the directors of the bankrupt, came into possession of facts sufficient to lead them reasonably to conclude that Fairmont was insolvent.

23. After the bankruptcy, the question of the value of the lease (as distinguished from the machinery thereon) was considered by the trustee, who, after inquiry, felt it valueless and abandoned it. I find from the evidence that this conclusion of the trustee was amply justified. Moreover, while the lease gave the bankrupt the right to remove additions placed on the leasehold by the former, if such removal could be made without damage to the other buildings on the leasehold, I find that such removal was not practical and the trustee properly made no endeavor in this direction.

On the basis of the foregoing findings of fact, my conclusions of law are:

### CONCLUSIONS OF LAW
#### Jurisdiction

█ This cause, instituted by the trustee in bankruptcy to void an alleged preference by the bankrupt under the provisions of the Bankruptcy Act, is properly cognizable in this Court. Flanders v. Coleman (1919), 250 U.S. 223, 227, 39 S.Ct. 472, 63 L.Ed. 948; 11 U.S.C.A. § 96(b), Bankruptcy Act § 60(b).

#### Merits

The law, rendering transfers by a bankrupt in advance of bankruptcy void, is clear. It was stated in Aulick v. Largent (C.C.A. 4 1961) 295 F.2d 41, 44–45, thus:

"It is well established that under Section 60, sub. a(1) of the Bankruptcy Act, certain elements must be present to constitute a preference, as follows:

"1. A debtor, making or suffering a transfer of his property,

"2. to or for the benefit of a creditor,

"3. for or on account of an antecedent debt resulting in a depletion of the estate,

"4. while insolvent, and

"5. within four months of bankruptcy,

"6. the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class.

"Under section 60, sub. b of the act, 11 U.S.C. § 96, sub. b, a preference is voidable by the trustee in bankruptcy only upon proof of the additional element that the creditor receiving or to be benefited by the preference had reasonable cause to believe that the debtor was insolvent. If any one of the elements of a preference as enumerated above is wanting, consideration may not be given to an avoidance of the transfer under section 60, sub. b, since a preference has not been established. The burden of proving the existence of these essential elements is upon the trustee seeking to avoid the transfer."

See also, Moran Bros., Inc. v. Yinger (C.A. 10 1963) 323 F.2d 699.

█ But the defendants urge that these general principles are inapplicable here, since they are the beneficiaries of a valid mechanics lien, the discharge of which will not work a preference. Admittedly, bankruptcy does not discharge valid liens. Greenblatt v. Utley (C.C.A. 9 1956) 240 F.2d 243, 247. The defendants had a valid mechanics lien, under the law of South Carolina, over and upon the plant addition constructed by them for the bankrupt. Cutler-Hammer, Inc. v. Wayne (C.C.A. 5 1939) 101 F.2d 823, 825, cert. den. 307 U.S. 635, 59 S.Ct. 1031, 83 L.Ed. 1517; Stone v. Mondie (D.C.Okl.1957) 157 F.Supp. 929, 931. But such lien is valid in bankruptcy against general creditors only to the extent of the value of the property over

which the lien exists; to give it any greater value would be preferential. Thus, in Ricotta v. Burns Coal & Building Supply Company (C.C.A. 2 1959) 264 F.2d 749, 751, the Court ruled:

"Moreover, the essence of a preference is that it depletes the bankrupt's estate available to remaining creditors. Bachner v. Robinson, 2 Cir., 107 F.2d 513, 514; Continental & Commercial Trust & Sav. Bank v. Chicago Title & Trust Co., 229 U.S. 435, 443–444, 33 S.Ct. 829, 57 L.Ed. 1268. Where the payment merely avoids the bite of a lien which the trustee could not have successfully attacked, no such depletion occurs. Accordingly the ruling below that the payments in question were in their entirety preferential is incorrect.

\* \* \* \* \* \*

" \* \* \* If the amounts it received during the four months prior to bankruptcy exceed that which it could have obtained through the filing and enforcing of liens for the same debts, then to the extent of that excess the estate available to the general creditors was depleted and the payments preferential. Cf. Perkins v. Lakeport Nat. Bank, D.C.N.H., 139 F.Supp. 898; In re Dibblee, D.C.S.D.N.Y. 1869, 7 Fed.Cas.No. 3,884, [651] at 656."

To the same effect is Small v. Williams (C.C.A. 4 1963) 313 F.2d 39, 44, in which the Court said:

"It is well-established, of course, that payments upon a preferred claim which have the effect of releasing assets of comparable value to the claims of general creditors are not preferential. They are not preferential because they do not deplete the debtor's estate or diminish the assets available for distribution among the general creditors. When the value of the security is substantially less than the secured claim, however, a partial payment upon the secured claim which does not effect a release of any of the security or reduce the claim to the extent that it is effectively secured, does result in a depletion of the debtor's estate."

See, also, Virginia National Bank v. Woodson (C.C.A. 4 1964) 329 F.2d 836, 840; Douglass v. Pugh (D.C.Ky.1959) 177 F.Supp. 274, 276, aff. 287 F.2d 500.

In this case, the property subject to the mechanics lien, passing into the hands of the trustee, was without value. The payment of the debt secured by such lien through the transfer of the coach did not have "the effect of releasing assets of comparable value to the claims of general creditors" but, on the contrary, resulted in a depletion of the assets of the bankrupt. Whether the transfer is preferential must, then, be determined, without regard to the mechanics lien, by the application of the general principles set forth in the Aulick Case, supra.

This transfer satisfies all the requirements for a preference under Section 60 save one, i. e., "the creditor receiving it or to be benefited thereby \* \* \* has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent." I have found as a fact that the defendants did not have such "reasonable cause \* \* \* to believe the debtor" to be insolvent until February 12. However, the transfer to the defendants had already been made on either February 7 or 8.

The contention that the transfer did not take place, that title to the coach did not pass, until the certificate of origin was prepared on February 15 is untenable. Passage of title is a matter of intent but, "The actual delivery of the goods is of the greatest importance as evincing an intention to pass title. If unaccompanied by an explanation or the specification of any condition, the buyer generally has a right to regard it as passing title." 46 Am.Jur., sec. 433, p. 602. The coach involved in this proceeding was delivered to the defendant on February 7 or 8; title passed at that time. It is of no moment that the actual execution of the certificate of origin was not prepared until February 15. "As between the parties", the transfer was ef-

242

fective despite such delay in the preparation of the certificate. See Section 46–150.15, Title 46, Code of Laws, South Carolina (1962); Grain Dealers Mut. Ins. Co. v. Julian, 247 S.C. 89, 99, 145 S.E.2d 685.

■ Since "at the time of the transfer", the defendants did not have reasonable cause to believe the bankrupt insolvent, the transfer is not void under section 60(b) of the Bankruptcy Act and judgment in favor of the defendants must be entered.

And it is so ordered.