amount of $2,398,348.63 in fees plus $15,-833.42 in expenses.

In re Ben L. PLECHATY, Debtor.

Mary Ann RABIN, Trustee, Plaintiff,

v.

B & M REALTY CORP.,
et al., Defendants.

Bankruptcy No. 94–14118.
Adversary No. 95–1487.

United States Bankruptcy Court,
N.D. Ohio.

Oct. 11, 1996.

Richard G. Hardy, Timothy J. Downing, Ulmer & Berne P.L.L., Cleveland, OH, for Plaintiff–Trustee.

William W. Jacobs, Kaufman & Cumberland Co., L.P.A., Cleveland, OH, for Defendants.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

The Trustee of Ben L. Plechaty, the Debtor in this involuntary chapter 7 case, filed this adversary proceeding against B & M Realty Corp. ("B & M") and D.W.W. & Associates, Inc. ("D.W.W.") to recover a $195,300 payment to B & M that the Trustee asserts is voidable as a preference under section 547 of the Bankruptcy Code. The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(F). This memorandum sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Background

In January 1994, B & M received $195,300 in the form of a check drawn on the account of Dorothy Plechaty, the Debtor's wife. The check had been made out to B & M by the Debtor but was signed by her. The purpose for the payment was to provide B & M funds with which to buy out two minority shareholders. According to the Trustee, the $195,300 were the proceeds of a loan from Mrs. Plechaty to the Debtor which he paid to B & M for application against a $600,000 loan to him from B & M which had been outstanding since 1991. If so, the transfer would be presumptively voidable under section 547(b) of the Bankruptcy Code since the parties have stipulated, or it is undisputed, that at the time of transfer the Debtor was insolvent; B & M was an insider of the Debtor and the transfer was made within the year preceding the date his case was filed; and B & M received more on its claim against the

Debtor than it would have received in this case since it appears that creditors will receive little or nothing.

B & M contends, however, that section 547(b) is inapplicable because the $195,300 was a new loan to it from Mrs. Plechaty, not a payment on the Debtor's outstanding loan. In the alternative, B & M argues that even if the $195,300 payment were deemed a loan from Mrs. Plechaty to the Debtor, payment to B & M was directed by Mrs. Plechaty, which insulates the $195,300 payment from preference attack under the earmarking doctrine articulated in *Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067 (6th Cir.1987).

B & M transferred the $195,000 to D.W.W., a corporate affiliate, which invested the funds for about three months and then returned them to B & M to effect the shareholder buy out. Notwithstanding return of the funds, the Trustee asserts that she is entitled to recover their value from D.W.W. under section 550(a) of the Bankruptcy Code.

For the reasons set forth below the Court concludes that the payment to B & M constituted a preferential transfer by the Debtor to B & M which is voidable under section 547(b) of the Bankruptcy Code, but that the Trustee is not entitled to recover the value of the transfer from D.W.W.

### The Loan

■ The form of the transfer to B & M does not of itself clearly establish its character. The only contemporary documentary evidence of the transfer is a check drawn on Mrs. Plechaty's bank account made payable to and cashed by B & M. On its face this check could have reflected a repayment of debt by Mrs. Plechaty, a contribution to B & M's capital, or, as B & M contends, a loan from Mrs. Plechaty to B & M. There is nothing in the form of the check to suggest, as the Trustee contends, that the $195,300 check reflected a loan from Mrs. Plechaty to the Debtor and a pay down of the Debtor's obligation to B & M. There were, however, actions by both the Debtor and B & M that unambiguously support the Trustee's theory. The Debtor maintained a running account of loans from his wife and recorded the $195,300 payment to B & M as a loan to him. B

& M recorded the $195,300 payment as a partial payment of its loan to the Debtor, not as a loan from Mrs. Plechaty. Standing alone these actions constitute unequivocal admissions by B & M and the Debtor that the $195,300 were the proceeds of a loan from Mrs. Plechaty to the Debtor.

B & M attempted to avoid these admissions by characterizing both the Debtor's record of the transaction and its own application of the $195,300 payment to reduce the Debtor's loan as mistakes. Consistent with its position, B & M changed the record of the $195,300 payment on its books, had its shareholders and directors adopt minutes, and its officers execute a note and other documents, casting the transaction as a $195,300 loan from Mrs. Plechaty to B & M.

The Trustee dismissed these actions as a sham designed to avoid liability. She rejected the notion that either B & M or Mrs. Plechaty determined the character of the $195,300 payment independently of the Debtor because of the Debtor's dominant role in his relationship with Mrs. Plechaty and with B & M. B & M attempted to support its theory by stressing that Mrs. Plechaty and B & M had the power and authority under the law to conduct their affairs independent of the Debtor and by downplaying the Debtor's role. Under B & M's theory the Debtor acted only as an advisor to Mrs. Plechaty and played no active role in B & M in connection with the $195,300 payment. These varying portrayals of the Debtor's role are relevant both to the Court's conclusion that Mrs. Plechaty loaned the $195,300 to the Debtor, not to B & M, and that the Debtor, not Mrs. Plechaty, controlled the payment of that loan to B & M.

The Debtor was a successful entrepreneur who, together with David Wright, had acquired and developed a number of substantial and profitable businesses. David Wright managed the day-to-day operations of B & M and other businesses under the Debtor's control. It appears that Mr. Wright was, in effect, the Debtor's junior partner in most of these businesses and owned a minority stake in the Debtor's businesses. By the late 1980's these businesses had prospered to the

extent that the Debtor had a net worth in excess of $27 million according to at least one financial statement furnished to a lender. In the late 1980's, however, the Debtor transferred the bulk of his holdings, including his interest in B & M, to or for the benefit of his wife Dorothy, his daughter Paula Cran, and her children. These businesses in which members of the Plechaty family own most of the beneficial interests, directly or indirectly, are sometimes referred to in this opinion as "Plechaty entities."

Neither the Debtor nor Mrs. Plechaty had a direct financial interest in B & M when the $195,300 payment was made. The Plechaty interest in B & M is held in trusts for the benefit of Mrs. Cran and her children. The buy out of B & M's minority shareholders was financed with dividends from The W.E. Plechaty Co., which was owned 90 percent by Mrs. Plechaty and 10 percent by Suzanne Wright, the wife of David Wright. The Plechaty and Wright interests also owned the controlling interest in B & M in approximately the same 90/10 ratio. The W.E. Plechaty Co. declared and paid dividends to Mrs. Plechaty and Mrs. Wright of $195,300 and $21,700, respectively. Mrs. Wright gave her husband a check for $21,700 payable to him. He endorsed the check to B & M. The Debtor drew a check payable to B & M for $195,300 for Mrs. Plechaty's signature. Wright delivered both checks to Eugene Feczko, B & M's secretary and bookkeeper. Feczko recorded the Wright payment as a reduction of Mr. Wright's loan from B & M. This treatment has not been questioned. Mr. Feczko recorded the Plechaty payment as a reduction of the Debtor's outstanding loan. According to Feczko, neither the Debtor, Mr. Wright, nor anyone else told him how to account for the $195,300.

The Debtor testified that after he transferred his interests in the Plechaty entities he largely withdrew from the active management of the Plechaty entities, which was left to Mr. Wright, and acted only as an advisor. Consistent with that portrayal, the Plechatys testified that Mr. Wright orchestrated the buy out of B & M's minority shareholders with the Debtor playing little if any role. These portrayals were intended

to make B & M's contention that Mrs. Plechaty decided to loan $195,300 to B & M plausible and to explain how B & M could have mistakenly accounted for the $195,300 payment. Although B & M's witnesses attempted to enhance Mrs. Plechaty's role and assign a passive advisor's role to the Debtor, their portrayals were not credible.

The Debtor is a bright and sophisticated businessman with a forceful and dominating personality. In recent years he has apparently financed his cash needs, including substantial gambling losses, largely from loans from Mrs. Plechaty and the $600,000 loan from B & M in 1991. Following the transfers it appears that he had few assets of his own and relied on receiving money from his wife. The record shows that this reliance was justified.

According to his records, the Debtor borrowed over $1.3 million from Mrs. Plechaty from 1992 through 1994 in 63 transactions involving 56 borrowings and 7 repayments. His net indebtedness to Mrs. Plechaty grew from approximately $64,000 at the end of 1992 to approximately $760,000 at the end of 1994. Mrs. Plechaty had little recollection of the scope or frequency of these transactions with her husband. She kept no record of these loans or repayments and was even unaware that he kept such records. She expressed no interest or concern with whether or when she would be repaid or with the Debtor's use of the loan proceeds, except that she disapproved of the Debtor's admitted and extensive gambling. There is, however, no evidence that she refused to loan money to the Debtor. Her attitude appeared to be that he had made the money and that he could have it when he wanted it. She said that except for the $195,300 loan to B & M she was not aware of having made loans to other Plechaty entities.

Mrs. Plechaty is and was legally blind and suffers from cardiovascular disease. She is a director or officer of several of the Plechaty entities including B & M. She testified, however, that she was "just sort of a figurehead" and did not have any active involvement in B & M or any of the other Plechaty entities. She was only vaguely aware of how the Plechaty entities were structured or of her own-

ership interests in them. It was clear from her testimony that whether due to ill health or otherwise, Mrs. Plechaty had neither the interest nor the ability to deal with such matters as financing the buy out of B & M's minority shareholders, but left these matters to the Debtor. Her testimony that she intended the $195,300 payment as a loan to B & M is inconsistent with her practice of making loans only to her husband and her inability to recollect the specifics of other loans. It is credible that she wanted to benefit Mrs. Cran and her children, who were beneficial owners of B & M. But the benefit to B & M was in receipt of the $195,300, not in whether it was received from the Debtor or Mrs. Plechaty. In fact, a pay down of the Debtor's loan was more beneficial to B & M than a new loan from Mrs. Plechaty. The Debtor was at that point insolvent. Therefore the $195,300 reduced an otherwise uncollectible debt. Moreover, if her testimony is to be believed, the loan to B & M rather than to the Debtor was a significant and nearly unique divergence from her practice of loaning money to him, and was made only with his advice and approval. But if so, it is unlikely that the Debtor would have forgotten the transaction and mistakenly recorded it as her loan to him and persisted in that mistake in his bankruptcy schedules and at his 341 exam.

Mrs. Cran testified that she is currently on the payroll of B & M and receives bi-weekly take-home pay of approximately $760 for doing "whatever they need," including secretarial work, cleaning up after people, and acting as a company gofer. Her husband is B & M's building superintendent. She was unsure whether she was an officer of B & M and admitted that she was "not real active" in its affairs. It was apparent from her testimony that she played no significant role in managing or directing the affairs of B & M and that she was not qualified to do so. Mrs. Cran's testimony reflects her obvious desire that B & M retain the $195,300 payment and she no doubt has discussed that payment with her mother. But the notion that she discussed with her mother the structure of the payment to B & M at the time it was made is implausible in view of the very limited knowledge that mother and daughter

had of the Plechaty entities. Moreover, as previously noted, the benefit to B & M was greater if the $195,300 were a pay down of the Debtor's loan rather than a new loan from her mother.

Mr. Feczko has been B & M's secretary and bookkeeper for a number of years and holds similar positions in other Plechaty entities. His responsibility was to keep B & M's books and prepare its financial and tax returns. He appeared to be careful and meticulous. It seems unlikely that he could have made a mistake involving so much money, not only on B & M's books, but later in its tax returns, and delayed so long in correcting it, without some reliable substantive basis for believing that the $195,300 was a pay down of the Debtor's loan. The only people actively involved with B & M were Feczko, Wright, and the Debtor. Feczko and the Debtor had their offices in the B & M building. It seems improbable that Mr. Feczko would not have questioned the Debtor or Mr. Wright unless he had good reason to believe that his treatment of the $195,300 payment was correct. According to Feczko's testimony, however, he did not discuss treatment of the $195,300 with the Debtor either before or after its payment. If so, the Debtor's restraint was truly extraordinary. The Debtor is for practical purposes Mr. Feczko's boss, and Feczko's "mistake" stands to cost B & M $195,-300. Mr. Feczko's effort to downplay the Debtor's role in the Plechaty entities was belied by the role the Debtor played with Feczko's knowledge in B & M's 1991 mortgage refinancing. At that time the Debtor was no longer an officer or shareholder of B & M but only one of its directors. Nevertheless, he led Bank One to believe that he was authorized to dictate the terms of the restructuring and in fact did so. His dominance over B & M is most clearly reflected by the fact that he arranged that $600,000 of Bank One's loan to B & M would be paid to him or on his behalf as an unsecured loan from B & M.

Feczko's testimony, if believed, dramatizes the implausibility of B & M's theory. Since, according to Feczko's story, which was echoed by the Debtor, the two had no communication about B & M's characterization of the

$195,300 payment, neither could have been the cause of, or have been influenced by the alleged mistake of the other. The odds that the Debtor and Mr. Feczko would independently make virtually identical mistakes are vanishingly small.

■ The plausibility of B & M's theory relies heavily on the fact that there was no contemporaneous formal corporate action characterizing the $195,300 payment and appears to presume that the nature of that payment remained undefined until B & M adopted corporate resolutions and drew up papers defining it. Mr. Feczko's conclusion that his contemporaneous characterization of the loan was a mistake was based on these corporate papers executed long after the fact. B & M's expert witness, who opined that the $195,300 payment was a loan from Mrs. Plechaty to B & M, limited his review for that opinion to B & M's corporate records and, so far as appears, carefully avoided any inquiry of the Debtor, Mrs. Plechaty, or anyone else who might have shed light on the parties' actual intentions. But in fact those intentions control and cannot be supplanted by subsequent actions, however detailed and formal.

Based on all the evidence the Trustee has borne her burden of showing that the $195,300 was intended as a loan from Mrs. Plechaty to the Debtor tendered to, and accepted by, B & M as a payment on the Debtor's loan obligation, and that B & M's subsequent actions and activities were an attempt to rewrite history not to rectify a mistake.

### Earmarking

■ This leaves the question of whether B & M can insulate the $195,300 payment from preference attack under the earmarking doctrine. In general, that doctrine applies where the lender, not the debtor, selects the debtor's creditor to be paid. *Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067 (6th Cir.1987).

The earmarking doctrine is described in Collier as follows:

In cases in which a third person makes a loan to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created. The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as such proceeds are clearly "earmarked."

A payment by a debtor with borrowed money, however, may constitute an avoidable preference where the loan so used was not made upon the condition that it should be applied to a particular creditor to whom it was paid over.

4 Collier on Bankruptcy ¶ 547.03 at 547–28, 547–29 (15th ed. 1996). The rationale for the earmarking doctrine is that if the lender dictates the recipient of the loan proceeds, those proceeds were not under the Debtor's control and should not constitute "an interest of the debtor in property" for purposes of section 547(b). *Hartley*, 825 F.2d at 1069.

■ The fact that the payment went directly from Mrs. Plechaty to B & M is not dispositive.

[A] payment made by a third party to a creditor of the debtor may likewise amount to a preferential transfer, when such payment represents a loan by the third party to the debtor and the debtor, rather than the lender, designates the creditor to be paid and controls the application of the loan.

4 Collier on Bankruptcy ¶ 547.03 at 547–29, 547–30. *Hartley* involved direct payment of the loan from the new lender to the old creditor but the court made clear that that fact alone would not obviate a successful preference attack:

The trustee argues that the earmarking rule could permit incipient bankrupts to prefer one creditor over another. To prevent such abuse a court may ascertain that the new lender, not the debtor, earmarks the funds for the particular creditor.

*Hartley*, 825 F.2d at 1072. See also, *Coral Petroleum, Inc. v. Banque Paribas–London*, 797 F.2d 1351, 1355 (5th Cir.1986); *Van Huffel Tube Corp. v. Artcraft (In re Van Huffel Tube Corp.)*, 74 B.R. 579, 585 (Bankr.

N.D.Ohio 1987); *Hargadon v. Cove State Bank (In re Jaggers)*, 48 B.R. 33, 36 (Bankr.W.D.Texas 1985).

Therefore the question under *Hartley* is whether Mrs. Plechaty or the Debtor controlled the application of the $195,300 loan proceeds by directing payment to B & M. The fact that B & M was designated as the payee on Mrs. Plechaty's check would, without further evidence explaining that designation, justify an inference that Mrs. Plechaty selected B & M. *See Hartley*, 825 F.2d at 1069; *Grubb v. General Contract Purchase Corp.*, 94 F.2d 70, 72–73 (2nd Cir.1938). But, as discussed in the prior section, there is considerable evidence to rebut that presumption and to support the conclusion that the Debtor designated B & M to receive the $195,300.

The Debtor, not Mrs. Plechaty, filled out the check for her signature, including the designation of B & M as payee. There is no credible evidence to support the conclusion that Mrs. Plechaty instructed the Debtor to show B & M as payee or that she conditioned the loan on payment of the proceeds to B & M. Compare the present facts with those in *Virginia National Bank v. Woodson (In re Decker)*, 329 F.2d 836 (4th Cir.1964), where the court applied the earmarking doctrine because the lender, the debtor's sister, insisted that the loan proceeds be used solely to pay the bank that was threatening her brother. *Hartley* described the facts in *Decker* as being very similar to the facts in *Hartley*. *Hartley*, 825 F.2d at 1071.

In this proceeding, by contrast, it appears clear that the Debtor, not Mrs. Plechaty, structured the buy out of B & M's minority shareholders for which the $195,300 was needed and arranged the payment to B & M. The suggestion by B & M's witnesses that David Wright engineered and directed the use of $195,300 in Plechaty funds without the Debtor's active and informed approval is not credible. It appears from the evidence that Mrs. Plechaty left such matters to her husband and would have signed the check if he had designated a different payee. This conclusion is also supported by the fact that there is no credible evidence which indicates that Mrs. Plechaty controlled the use of the proceeds in any of her many prior loans to the Debtor.

The Court's finding is not inconsistent with Mrs. Plechaty's ownership of, or right to control, her assets. The question is not whether she could have restricted use of the proceeds to pay down the Debtor's obligation to B & M. There is no suggestion that she lacked that right. The question is whether she in fact did so and the evidence is quite clear that she did not. As she had on numerous prior occasions, she left use of proceeds of her loans to the Debtor.

■ B & M argues that the earmarking doctrine applies because the $195,300 payment did not diminish the Debtor's estate. This argument has superficial appeal since the loan would probably not have been arranged by the Debtor or the payment made to B & M except for the purpose of buying out B & M's minority shareholders. Therefore, B & M argues, the $195,300 would never have been available to the Debtor's other creditors and its payment to B & M did not diminish the Debtor's estate. But this argument would apply with the same force if the Debtor had arranged the loan at his bank and directed it to pay the $195,300 to B & M.

The courts have without exception, so far as the Court can discover, held that the debtor's estate was diminished where the debtor controlled the application of the loan proceeds. *See Hansen v. MacDonald Meat Co. (In re Kemp Pacific Fisheries, Inc.)*, 16 F.3d 313, 316 (9th Cir.1994); *In re Smith*, 966 F.2d 1527, 1535–37 (7th Cir.1992); *Hartley*, 825 F.2d at 1070; *Coral Petroleum*, 797 F.2d at 1359–61. In general, diminution of the estate has been an issue separate from control only where the lender designated the creditor to be paid but the debtor transferred property to the lender to induce or secure the loan. In those cases the courts focused on the harm to the debtor's other creditors arising from the transfer to the lender and held the payment to the creditor was a preference to the extent of the value transferred to the lender. *Hartley*, 825 F.2d at 1071; *Decker*, 329 F.2d at 839–40.

■ Therefore it appears that applying the earmarking doctrine to these facts to

insulate the $195,300 from recovery by the Trustee is not supported by the earmarking cases. It would, moreover, conflict with the purpose of section 547(b). Section 547 was intended to implement two important bankruptcy policies: first, the "prime bankruptcy policy of equality of distribution among creditors", H.R.Rep. No. 595, 95th Cong., 2d Sess. 177–78 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6137–39; and second, to reduce creditor incentive to dismember a financially pressed debtor. *Id.;* see *Smith,* 966 F.2d at 1535. An extension of the earmarking doctrine to these facts would seriously conflict with the policy of equality of distribution among creditors by permitting an admitted insider of the Debtor to retain more than its fair share of the Debtor's assets in payment of its claim.

### Transferee Liability

■ Promptly after receipt from the Plechatys and the Wrights of the $217,000 to be used in the minority buy out, B & M transferred the money to D.W.W. for investment pending the buy out. D.W.W. invested the money with Smith Barney. About three months thereafter D.W.W. returned the $217,000 to B & M which used it to buy out the two minority shareholders. The Trustee invoked section 550(a)(2) of the Bankruptcy Code to recover the $195,300 from D.W.W. despite its return to B & M. Sections 550(a) and (b) provide as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550.

D.W.W. was the immediate transferee of the $195,300 under section 550(a)(2). The Trustee argues that D.W.W.'s return of the money does not avoid its liability because of the language of section (a) which permits the trustee to recover the "value" of the property transferred. She also argues that D.W.W. cannot shield the transfer under subsection (b) because D.W.W. did not give value for the transfer from B & M.

The Trustee cites no authority for the proposition that the trustee can recover the value of the transfer from a transferee that has returned the preferential payment to the initial transferee. Although the language of section 550(a) can be read to support the Trustee's position, the apparent purpose of permitting the trustee to recover the value of the transfer is to provide an appropriate remedy where a transferee has spent or converted the property transferred, see *Aero–Fastener, Inc., v. Sierracin Corp. (In re Aero–Fastener, Inc.),* 177 B.R. 120, 139 (Bankr.D.Mass.1994), and the language "if the court so orders" appears to afford the court some discretion in determining when such recovery should be allowed. Where, as here, the preferential payment was returned and there is no evidence that the transfer between B & M and D.W.W. was made in bad faith or adversely affected the Trustee, the Court believes that section 550(a) should not be applied to subject D.W.W. to liability for the value of the transfer.

■ It also appears that D.W.W. is protected under section 550(b)(2). There is no evidence to suggest that D.W.W. knew that the $195,300 was voidable and the payment to D.W.W. and its repayment to B & M occurred in what appears to have been the regular course of their businesses. The Plechaty companies managed their cash jointly. Therefore, even though B & M received no interest on the $195,300, this does not necessarily establish that the transfer to B & M was made without consideration for purposes

of section 550(b)(2). Since the transfer was part of the regular cash management procedures of the Plechaty companies, it is reasonable to conclude that B & M benefitted from such procedures generally. If so, this was value for the advance to D.W.W. for purposes of 550(b)(1).

The Trustee's justification for subjecting D.W.W. to liability is that her collection efforts against B & M may be frustrated because of the Debtor's control and manipulation of B & M and that it is fair to recover the preference from another entity controlled by the Debtor. This is, in effect, an argument that the separate corporate shells of the Plechaty entities should be disregarded and their assets treated as the Debtor's property. The Trustee did not, however, plead or attempt to prove that the corporate veils of B & M or D.W.W. could be pierced in this fashion. Therefore the Court finds that the Trustee has not established that recovery against D.W.W. is permitted under section 550 of the Bankruptcy Code.