PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: ESA ENVIRONMENTAL
SPECIALISTS, INC.,

*Debtor.*

STANLEY MARVIN CAMPBELL,

*Plaintiff-Appellant,*

v.

THE HANOVER INSURANCE COMPANY,

*Defendant-Appellee.*

No. 11-2150

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Senior District Judge.
(3:10-cv-00578-GCM; 3:09-ap-03143; 3:07-bk-31532)

Argued: October 25, 2012

Decided: March 1, 2013

Before TRAXLER, Chief Judge, and WILKINSON and
AGEE, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the major-
ity opinion, in which Judge Wilkinson joined. Chief Judge
Traxler wrote a dissenting opinion.

**COUNSEL**

Allen Burton Shuford, THE BAIN GROUP, PLLC, Charlotte, North Carolina, for Appellant. William L. Esser, PARKER, POE, ADAMS & BERNSTEIN, LLP, Charlotte, North Carolina, for Appellee.

---

**OPINION**

AGEE, Circuit Judge:

The Trustee in bankruptcy of ESA Environmental Specialists, Inc. ("ESA") appeals from the affirmance by the district court of the award of summary judgment by the bankruptcy court to The Hanover Insurance Co. ("Hanover"). The bankruptcy court concluded that ESA's transfer of $1.375 million to Hanover within 90 days of ESA's filing a petition for bankruptcy was not an avoidable preference under 11 U.S.C. § 547(b). For the reasons set forth below, we affirm the award of summary judgment to Hanover.

I

Background and Proceedings Below

ESA was an environmental and industrial engineering firm that sought and performed construction projects under contract with the federal government. Pursuant to the Miller Act, ESA was required to obtain and furnish to the government two types of surety bonds[1] as a condition precedent "[b]efore any contract of more than $100,000 [could be] awarded for

---

[1]The surety bonds included performance bonds to protect the government if the contractor failed to complete a contract, 40 U.S.C. § 3131(b)(1), and payment bonds to protect "all persons supplying labor and material in carrying out the work provided for in the contract," *id.* § 3131(b)(2).

the construction, alteration, or repair of any public building or public work of the Federal Government." 40 U.S.C. § 3131(b). These surety bonds functioned to secure ESA's obligation to complete its contract and pay its vendors and subcontractors. *See id.*

In 2006, Hanover issued surety bonds on behalf of ESA prior to the federal government's award of eight contracts to ESA (the "Existing Projects"). In April 2007, ESA borrowed $12.2 million from Prospect Capital Corp. ("Prospect") to, among other things, meet current working capital needs, repay existing indebtedness, and "fund costs associated with entering into and fulfilling government contracts." (J.A. 655.) In May 2007, ESA asked Hanover to issue additional surety bonds (the "New Bonds") in conjunction with seven additional government contracts that ESA sought to obtain (the "New Contracts" and collectively with the Existing Projects, the "Government Contracts"). ESA could not commence work on the New Contracts until it tendered the New Bonds to the appropriate government agencies, as the New Bonds were a condition precedent to the final contract award to ESA. Hanover, concerned about ESA's financial stability, would not issue the New Bonds without additional security over and above the bond premiums. The parties agreed upon a letter of credit as the additional security by which Hanover would agree to issue the New Bonds. ESA was required to obtain an irrevocable letter of credit from SunTrust Bank ("SunTrust") in the amount of $1.375 million with Hanover as the beneficiary (the "Letter of Credit"). The Letter of Credit would collateralize the New Bonds but also all of Hanover's existing guarantees and surety obligations on behalf of ESA. The bond premiums on the New Bonds totaled $74,624, and the face value of the New Bonds totaled $7.9 million.

As a condition precedent to issuance of the Letter of Credit, SunTrust required ESA to fund a certificate of deposit at Sun-Trust in the amount of $1.375 million (the "CD") as security for the Letter of Credit. ESA had limited cash reserves, so it

turned to Prospect for the additional capital necessary to fund the CD. Prospect and ESA then amended their existing credit agreement to increase the principal amount of Prospect's existing loan to ESA by a total of $1.575 million (the "Prospect Loan").[2] On May 8 and May 17, 2007, in two separate transfers, Prospect tendered the Prospect Loan funds directly to ESA, and ESA deposited those funds into its bank account. On May 17, 2007, ESA transferred $1.375 million of the Prospect Loan proceeds to SunTrust to fund the CD to secure the Letter of Credit for Hanover.[3] SunTrust then issued the Letter of Credit, and Hanover in turn issued the New Bonds, which ESA delivered to the appropriate federal government agencies for final award of the New Contracts.

Despite being awarded the New Contracts, ESA's financial condition continued to deteriorate and it filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Western District of North Carolina on August 1, 2007. Hanover then drew on the Letter of Credit, receiving the $1.375 million face amount from SunTrust, which liquidated the CD.

In the course of ESA's bankruptcy proceeding, the bankruptcy court approved the sale of substantially all of ESA's assets to Prospect. As part of that sale, ESA assigned to Integrated Contract Services ("ICS"), an affiliate of Prospect, (i) its rights under the Government Contracts, (ii) all of its litigation claims or causes of action, including its preference and avoidance claims (the "Litigation Rights"), and (iii) its right to the return of any collateral remaining upon the completion

---

[2]Prospect and ESA first amended their existing credit agreement on May 7, 2007, to increase the principal amount of Prospect's loan to ESA by $625,000, from $12.2 million to $12.825 million. On May 17, 2007, Prospect and ESA executed a second amendment to their existing credit agreement, increasing the principal amount of the loan by an additional $950,000, from $12.825 million to $13.775 million.

[3]Apparently, ESA used the remaining $200,000 of the Prospect Loan funds in its operations, and that amount is not at issue in this appeal.

of the Government Contracts. Shortly thereafter, ICS ceased operations and assigned ESA's assets, including the Litigation Rights, back to Prospect. Neither ICS nor Prospect commenced work on the Government Contracts, but Hanover remained bound by the surety bonds to provide for successful completion of those contracts.

In February 2008, the bankruptcy court entered an order allowing Hanover to take responsibility for the completion of the Government Contracts. Hanover represents, without contradiction, that "[s]ince entry of that order, Hanover fulfilled its obligations . . . , including ensuring that the [G]overnment [C]ontracts were completed and subcontractors paid." (Appellee's Br. 7.)

Also in February 2008, on Prospect's motion, the bankruptcy court entered an order converting ESA's case from Chapter 11 to a Chapter 7 proceeding and directing the appointment of a Chapter 7 trustee. Stanley Campbell was duly appointed as the Chapter 7 trustee for ESA (the "Trustee") and took control of ESA's bankruptcy estate. In July 2009, the bankruptcy court entered an order approving a stipulation agreement between Prospect and the Trustee, under which Prospect assigned the Litigation Rights to the Trustee, and the Trustee agreed to split the proceeds from any successful actions with Prospect.[4]

Subsequently, the Trustee filed an adversarial proceeding against Hanover, alleging that Hanover was an indirect beneficiary of ESA's transfer of the Prospect Loan proceeds into the CD and that this transfer was an avoidable, preferential transfer under 11 U.S.C. § 547. Hanover asserted two affirmative defenses to the Trustee's claims in the bankruptcy court:

---

[4]Under the stipulation agreement, Prospect would receive 75 percent of the balance of any proceeds after costs and fees. ESA's bankruptcy estate would retain the remaining 25 percent for distribution to ESA's creditors, including Prospect.

(1) that the transfer was not a preference because the Prospect Loan proceeds were earmarked specifically for payment to Hanover, and (2) that ESA received new value in exchange for the Prospect Loan proceeds. Hanover contended either of these affirmative defenses barred the Trustee's claims as a matter of law and moved for summary judgment.

The bankruptcy court granted summary judgment in favor of Hanover, holding both the earmarking and new value defenses applied to prevent a determination that ESA's transfer of funds was a preferential transfer and avoidable by the Trustee. Further, the bankruptcy court also opined that "[i]t would be inequitable to require Hanover to return the portion of the Prospect [Loan] used to cover the costs to complete the [Government Contracts] when Hanover did the work, and paid the obligations." (J.A. 924.) The Trustee appealed the bankruptcy court's judgment to the United States District Court for the Western District of North Carolina, which affirmed. From the district court's affirmation of the bankruptcy court's grant of summary judgment, the Trustee now timely appeals. We have jurisdiction under 28 U.S.C. §§ 158, 1291.

## II

### Standard of Review

When considering an appeal from a district court acting in its capacity as a bankruptcy appellate court, we conduct an independent review of the bankruptcy court's decision, reviewing factual findings for clear error and legal conclusions de novo. *See Banks v. Sallie Mae Serv. Corp.* (*In re Banks*), 299 F.3d 296, 300 (4th Cir. 2002). A bankruptcy court properly grants summary judgment when no genuine issues of material fact exist and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A trustee in bankruptcy

may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made . . . on or within 90 days before the date of the filing of the petition; . . .

(5) that enables such creditor to receive more than such creditor would receive if . . . the transfer had not been made.

11 U.S.C. § 547(b). The trustee bears the burden of proving the avoidability of a transfer under § 547(b). *Id.* § 547(g).

III

Analysis

Hanover does not contest that the Trustee has presented a prima facie case under § 547(b) for the avoidance of the transfer to it of the $1.375 million. Instead, Hanover contends that it has established three affirmative defenses to avoidance: earmarking, new value, and equity. First, the Trustee argues that the bankruptcy court improperly applied the earmarking defense because ESA did not use the Prospect Loan proceeds to pay an antecedent debt. Second, the Trustee argues that the bankruptcy court improperly applied the new value defense because Hanover did not prove with specificity the amount of the new value it provided ESA and the bankruptcy court clearly erred in its findings of fact. Third, the Trustee argues that the bankruptcy court improperly held in favor of Hanover

on independent equitable grounds, which are not recognized as a defense to an avoidance action in bankruptcy. We address each argument in turn.

## A

## Earmarking

The earmarking defense in bankruptcy is a judicially created exception to the statutory power of the bankruptcy trustee under § 547 to avoid or set aside an otherwise preferential transfer of assets.[5] *See McCuskey v. Nat'l Bank of Waterloo* (*In re Bohlen Enters., Ltd.*), 859 F.2d 561, 565 (8th Cir. 1988). The earmarking defense applies "[w]hen a third person makes a loan to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor." 5 *Collier on Bankruptcy* ¶ 547.03[2][a] (16th ed. 2011); *see Va. Nat'l Bank v. Woodson* (*In re Decker*), 329 F.2d 836, 839 (4th Cir. 1964) (holding that a transfer was not an avoidable preference when it "was made for the specific purpose of paying at least a portion of a particular debt"). The proceeds of such an "earmarked" loan "never become part of the debtor's assets and therefore no preference is created" because the transfer does not diminish the value of the debtor's estate.[6] 5 *Collier on*

---

[5]As a judicially created exception to a statutory rule, the earmarking defense must be narrowly construed. *See Sheppard v. Riverview Nursing Ctr., Inc.*, 88 F.3d 1332, 1344 n.5 (4th Cir. 1996) (noting that the "special circumstances" exception under 42 U.S.C. § 2000e-5(g)(2)(B) "is judicially created and should be narrowly construed" (citing *Hatfield v. Hayes*, 877 F.2d 717, 720 (8th Cir. 1989))); *see also Storm v. Storm*, 328 F.3d 941, 944 (7th Cir. 2003) ("[T]he probate exception, as a judicially created exception to the statutory grant of diversity jurisdiction, should be construed narrowly."); *Love v. Deal*, 5 F.3d 1406, 1410 (11th Cir. 1993) ("Because the special circumstances exception is a judicially created concept, we have held that it should be construed narrowly so as not to interfere with the congressional purposes behind the fee award statutes.").

[6]While § 547(a) clearly establishes that the trustee in bankruptcy bears the ultimate burden of proof of the avoidability of a transfer under

*Bankruptcy* ¶ 547.03[2][a]; *see Decker*, 329 F.2d at 839 ("As a general rule, such a payment, in and of itself and without more, will not create a voidable preference since there has been no diminution of the value of the estate.").

This Circuit has previously recognized the earmarking defense in *Decker*, but only in the limited circumstance of a direct payment from one creditor to another. 329 F.2d at 839. In *Decker*, the debtor had overdrawn his bank accounts by about $8,000. *Id.* at 838. Shortly before filing for bankruptcy, the debtor's sister paid the bank the existing $8,000 debt to cover the overdrafts and became a creditor of the debtor in approximately the same amount as he had owed the bank. *Id.* at 839. The debtor's trustee in bankruptcy attempted to avoid the $8,000 transfer from the debtor's sister to the bank as preferential, arguing that the payment was in essence a loan to the debtor and that the debtor's estate diminished when the $8,000 was paid to the bank. *Id.*

In considering this argument, we first noted the basic principle of bankruptcy that, "[i]f an unconditional loan is made to a bankrupt, the loan proceeds become part of the bank-

---

§ 547(b), the burden as to the earmarking defense is not as clear. A majority of the Circuits hold that, once the trustee meets his burden of proving the avoidability of a transfer under § 547(b), the burden "shifts to the defendant in the preference action to show that the funds were earmarked." *Schubert v. Lucent Tech. Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 401 (3d Cir. 2009) (quoting *Metcalf v. Golden* (*In re Adbox, Inc.*), 488 F.3d 836, 842 (9th Cir. 2007)) (quotation marks omitted); *see Chase Manhattan Mortg. Corp. v. Shapiro* (*In re Lee*), 530 F.3d 458, 470 (6th Cir. 2008) (placing the burden of proving the earmarking defense on the defendant). The Eighth Circuit holds, however, that "the trustee [has] the burden to prove the earmarking defense does not apply." *Kaler v. Cmty. First Nat'l Bank* (*In re Heitkamp*), 137 F.3d 1087, 1089 (8th Cir. 1998). We need not resolve this conflict in order to answer the earmarking issue in this case because the undisputed facts establish that the earmarking defense does not apply as a matter of law, as we more fully discuss below.

rupt's free assets." *Id.* We then concluded that "in the case at bar, it is clear . . . that the payment of the $8,000.00 by Miss Decker was not an unconditional loan for the benefit of all creditors but was made for the specific purpose of paying at least a portion of a particular debt owed to the bank." *Id.* at 839. We concluded that "[a]s a general rule, such a payment, in and of itself and without more, will not create a voidable preference since there has been no diminution of the value of the estate." *Id.* We then stated that "[t]he test is not what the creditor receives but what the bankrupt's estate has lost. It is the diminution of the bankrupt's estate, not the unequal payment to creditors, which is the evil sought to be remedied by the avoidance of a preferential transfer."[7] *Id.* at 840.

Since our opinion in *Decker*, courts have uniformly held that the earmarking defense applies "whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of his claim, so long as the proceeds are clearly 'earmarked.'" 5 *Collier on Bankruptcy* ¶ 547.03[2][a]. Courts continue to recognize, though, that "[a] payment by a debtor with borrowed money . . . may constitute a preference when the loan so used was not made upon the condition that it should be applied to the particular creditor to whom it was paid over." 5 *Collier on Bankruptcy* ¶ 547.03[2][a] (citing *Brown v. First Nat'l Bank of Little Rock*, 748 F.2d 490, 492 n.6 (8th Cir. 1984); *Smyth v. Kauf-*

---

[7]It may be useful to give a generic example of a transfer that should qualify as an earmark that is not an avoidable preference in bankruptcy. If X chose to pay debtor A's debt to creditor Y, there is a preference received by creditor Y when compared to all debtor A's other creditors: that is, Y got paid before any of A's similarly situated creditors were paid. But, for bankruptcy purposes, the debtor's bankruptcy estate is unchanged: its assets are no greater and no less than before the transfer from X to Y. In liquidation of A's bankruptcy estate, A's creditors would receive no less than they would have received had the X to Y transaction never taken place. In effect, the transfer of assets from X to Y resembles a novation as X simply takes the place of creditor Y with respect to debtor A.

*man* (*In re J.B. Koplik & Co.*), 114 F.2d 40, 42 (2d Cir. 1940)).

The bankruptcy court here correctly recognized that the Fourth Circuit adopted the concept of the earmarking defense as an affirmative defense in bankruptcy in *Decker*. However, the bankruptcy court erred in its determination that the earmarking defense applies in this case. The transfer from Prospect to ESA to SunTrust and later to Hanover lacks a critical element of an earmarking defense: the funds at issue were not used to pay an antecedent debt.

The $1.375 million at issue in this case was not transferred directly from creditor to creditor, i.e., from Prospect to Hanover. Instead, ESA received the funds from Prospect, placed the funds in its own bank account, and only later deposited the funds with SunTrust to secure Hanover. The parties argue at length over whether ESA had control over the Prospect Loan proceeds so that those funds could not be deemed earmarked under our precedent in *Decker*. Resolution of that factual dispute, however, is irrelevant to the determination of whether Hanover's earmarking defense applies because Hanover failed to prove a fundamental element of earmarking—that the transferred funds paid an antecedent debt of the debtor, ESA.

The earmarking doctrine applies only when the debtor borrows money from one creditor and the terms of that agreement require the debtor to use the loan proceeds to extinguish specific, designated, existing debt. *See* 5 *Collier on Bankruptcy* ¶ 547.03[2][a] (citing *Brown*, 748 F.2d at 492 n.6; *Smyth*, 114 F.2d at 42). "Accordingly, the proper inquiry is . . . whether the debtor had the right to disburse the funds to whomever it wished, or whether [the] disbursement was limited to a particular old creditor or creditors under the agreement with the new creditor." *Adams v. Anderson*, (*In re Superior Stamp & Coin Co.*), 223 F.3d 1004, 1009 (9th Cir. 2000). Without the satisfaction of an antecedent debt of the debtor by the new creditor, the concept of earmarking cannot

apply: there is no debt by which one creditor is substituted for another. *See Decker*, 329 F.2d at 838 ("It is clear that it was the intention of Vivian Decker[, as a new creditor,] that the $8,000.00 paid by her to the bank was to be applied toward satisfaction of an antecedent debt of Decker[, the debtor in bankruptcy,] to the bank."). In the case at bar, a new debt was created where none previously existed.

Even were we to assume, *arguendo*, that Prospect loaned ESA the funds at issue for the specific purpose of securing Hanover, ESA did not use the loan proceeds to pay an existing debt. Here, ESA borrowed money from Prospect—incurring new debt—and used those funds to collateralize both existing obligations to Hanover as well as the New Bonds—a new debt not previously owed to any creditor. ESA did not use the Prospect Loan funds to pay antecedent or old debt, nor did ESA merely substitute one creditor for another so that the pot available to pay existing creditors was unaffected by the transfer. To the contrary, ESA now owes a much higher total debt than it did before the Prospect Loan, thereby diminishing the share available from ESA's bankruptcy estate for repayment of ESA's existing creditors.

Hanover does not contest that ESA used the Prospect Loan proceeds to secure its obligations to Hanover rather than to pay an antecedent debt. Nor does Hanover assert that ESA in fact substituted one creditor for another. Consequently, the earmarking defense cannot apply in this case. The bankruptcy court therefore erred in holding that an earmarking defense applied to prevent the Trustee from avoiding the transfer to Hanover under § 547.[8]

---

[8]Moreover, the bankruptcy court made a legally inconsistent determination that Hanover established both a complete earmarking defense and a complete new value defense. As an element of the earmarking defense, the defendant in an avoidance action must prove that the alleged preferentially transferred funds were used to pay an antecedent debt. As discussed in more detail below, the new value defense applies in the opposite situa-

B

New Value

In contrast to the judicially created earmarking defense, the "new value" defense is an explicit statutory defense to a § 547(b) preference action:

> The trustee may not avoid under this section a transfer—
>
> > (1) to the extent that such transfer was—
> >
> > > (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
> > >
> > > (B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1). The statute defines "new value" as

> money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the

tion—when the allegedly preferentially transferred funds were used not to pay antecedent debt, but, instead, to support a new transaction. *See United Rentals Inc. v. Angell*, 592 F.3d 525 (4th Cir. 2010) ("[The new value defense] was designed to prevent trustees from avoiding payments that were clearly intended to support a new transaction, instead of an antecedent debt." (quoting *Batlan v. TransAmerica Comm. Fin. Corp.* (*In re Smith's Home Furnishings, Inc.*), 265 F.3d 959, 965 n.4 (9th Cir. 2001)) (internal quotation marks omitted)). Thus, at least in most circumstances, the earmarking and new value defenses are mutually exclusive.

trustee under any applicable law, including proceeds
of such property, but does not include an obligation
substituted for an existing obligation.

11 U.S.C. § 547(a)(2). Congress intended § 547(c)(1) "to
encourage creditors to continue to deal with troubled debtors"
by "prevent[ing] trustees from avoiding payments that were
clearly intended to support a new transaction, instead of an
antecedent debt." *United Rentals*, 592 F.3d at 529 (quoting 5
*Collier on Bankruptcy* ¶ 547.04[1]; *Batlan*, 265 F.3d at 965
n.4) (internal quotation marks omitted). A payment may sup-
port a new value defense even if the debtor receives it "from
a party other than the creditor." 5 *Collier on Bankruptcy*
¶ 547.04[1][c]. When evaluating a new value defense, the key
question is whether the alleged preferential transfer dimin-
ished the debtor's estate, i.e., whether the debtor in fact
acquired a new asset that offset the loss in value to the estate
when the debtor transferred existing assets to acquire the new
asset at issue. *See id.*

The party asserting the new value defense (Hanover, in this
case) bears the burden of proof. *See United Rentals*, 592 F.3d
at 531. As part of that burden, the party asserting the new
value defense must prove that (1) "the parties *intend*[ed] the
transaction to be substantially contemporaneous" and (2) "the
exchange of new value between the debtor and the defendant
[was] *in fact . . .* substantially contemporaneous." 5 *Collier on
Bankruptcy* ¶ 547.04[1][a] & [b]. The party bearing the bur-
den of proof also "must prove with specificity the new value
given to the debtor." *Jet Fla., Inc. v. Am. Airlines, Inc.* (*In re
Jet Fla. Sys., Inc.*), 861 F.2d 1555, 1559 (11th Cir. 1988); *see
Lowrey v. U.P.G., Inc.* (*In re Robinson Bros. Drilling, Inc.*),
877 F.2d 32, 34 (10th Cir. 1989); *see also* 5 *Collier on Bank-
ruptcy* ¶ 547.04 n.6.

As to the new value defense element of intent to make a
contemporaneous exchange, § 547(c)(1)(A), the Trustee does
not dispute that ESA and Hanover intended the $1.375 million

transfer to be a contemporaneous exchange for new value in the form of the New Contracts.[9,10] The Trustee does argue, however, that the bankruptcy court erred in its new value determination for all other § 547(c)(1) purposes in two ways. First, the Trustee contends that Hanover failed to carry its burden of proof in the bankruptcy court to establish with specificity the exact measure of the new value received by ESA and that the bankruptcy court clearly erred in its finding that the New Contracts had a value in excess of $1.375 million. Second, the Trustee argues that the bankruptcy court clearly erred in its conclusion that ESA in fact received the New Contracts in contemporaneous exchange for its transfer to Hanover, notwithstanding the intent of the parties.

Because these arguments focus on the bankruptcy court's findings of fact regarding the value of the New Contracts, we reiterate that we apply clear error review. *Banks*, 299 F.3d at 300. This means that we will not reverse the trial court's finding of fact that has support in the evidence unless that finding

---

[9]In representations to this Court at oral argument, Hanover proffered that it would use only part of the $1.375 million it received from drawing on the Letter of Credit in fulfilling the New Contract obligations. Hanover stated that it would be in a position to return the remaining collateral, estimated to be between $500,000 and $600,000, to ESA's bankruptcy estate upon final completion of the remaining New Contracts. We consider Hanover's proffer to the Court to be its affirmative obligation to fulfill by tendering the remaining collateral funds to the Trustee on behalf of the bankruptcy estate.

[10]The Chief Judge, in dissent, argues that Hanover failed to meet its burden of proving that the New Contracts had a commercial value of at least $1.375 million. Yet the Trustee admitted that the New Contracts were, in and of themselves, an asset with an ascertainable value. That is not surprising, as the transfer of contracts—whether as an asset for sale or as secured collateral—is a commonplace factor of commercial life. That the New Contracts were indeed a fungible commercial asset—and clearly "new value" for § 547(c) purposes—is well represented by the facts of this case. Not only were the New Contacts an item given as collateral, but were indeed bought and conveyed among ESA, ICS, Prospect and, ultimately, Hanover.

is clearly wrong. *Chesapeake Lighterage & Towing Co. v. Balt. Copper Smelting & Rolling Co.*, 40 F.2d 394, 395 (4th Cir. 1930). Applying this standard of review, the Trustee's arguments fail.

The Trustee does not contest that the New Contracts have value—he states in his reply brief that the measure of value of these contracts "is the expectation of the parties at the time of the transfer." (Reply Br. 17 (citing *Creditors' Comm. v. Spada* (*In re Spada*), 903 F.2d 971, 975 (3d Cir. 1990)).) Instead, what the Trustee argues is that Hanover failed to meet its burden of proving the value of the New Contracts with the requisite specificity. The thrust of the Trustee's position is that Hanover presented evidence demonstrating only a vague assertion that the New Contracts had value "in excess of $1,375,000" and thus failed to prove with specificity the amount of the new value ESA received. We disagree.

Below, Hanover asserted, and the bankruptcy court agreed, that ESA received new value in the form of the New Contracts as a result of the transfer of funds (from Prospect to ESA to SunTrust to Hanover).[11] In finding that the New Contracts constituted new value in excess of the transferred asset, the $1.375 million cash, the bankruptcy court relied on the affidavit of ESA's former Chief Executive Officer, Charles Jacob Cole, (the "Cole Affidavit") who stated that the "government contracts awarded to ESA had a face amount in excess of $3.9 million and the New Bonds provided ESA with the ability to proceed with the new government contracts and to earn revenues in excess of $1,375,000—the face amount of the Letter of Credit." (J.A. 584.) The Trustee introduced no evidence to contradict the Cole Affidavit or to establish any

---

[11]The bankruptcy court also concluded that ESA received new value from Hanover in the form of the New Bonds. Because we conclude that the bankruptcy court did not clearly err in its finding regarding the value of the New Contracts, we do not address the bankruptcy court's determination regarding the New Bonds as new value.

other measure of value for the New Contracts. Neither before the bankruptcy court, the district court, nor this court has the Trustee contended that Hanover's evidence, the Cole Affidavit, was inherently incredible or that Mr. Cole was being untruthful. The Trustee simply disagreed with Mr. Cole's conclusion.

Once Hanover offered its uncontradicted evidence that ESA received new value in excess of $1.375 million—the amount of the alleged preferential transfer—Hanover did not need to demonstrate any exact figure beyond that amount. Hanover only needed to prove with specificity that the New Contracts had a value at least as great as the amount of the alleged preferential transfer in order to demonstrate that ESA's bankruptcy estate had not diminished as a result of the transfer. Thus, on the record evidence before the bankruptcy court that the value of the New Contracts met or exceeded the amount of the alleged preferential transfer—the $1.375 million—the court did not err in concluding that Hanover had carried its burden to "prove with specificity the new value given to the debtor." *Jet Fla.*, 861 F.2d at 1559.

Relatedly, the Trustee also argues that the bankruptcy court's finding of fact that the New Contracts constituted new value in excess of $1.375 million was clearly erroneous. Although the Trustee disagreed with Hanover's proposed valuation of the New Contracts, the Trustee wholly failed to present any evidence that contradicts Hanover's valuation evidence or conflicts with the bankruptcy court's finding regarding the value of the New Contracts. Once Hanover presented credible evidence regarding the value of the New Contracts, the burden shifted to the Trustee to present some competent evidence supporting his position to defeat Hanover's motion for summary judgment. The Trustee did not do so. *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 308–09 n.17 (4th Cir. 2004) ("If the movant presents credible evidence that, if not controverted at trial, would entitle him to a Rule 50 judgment as a matter of law that evidence must be accepted as true

on a summary-judgment motion when the party opposing the motion does not offer . . . evidentiary material supporting the opposing contention." (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2727 (3d ed. 1998))). The Trustee simply failed to carry his burden of persuasion once Hanover met its burden of proof. Thus, the bankruptcy court did not clearly err in its finding that the New Contracts constituted new value in excess of $1.375 million.

As to the Trustee's second argument—that any new value ESA received was not, as a matter of fact, contemporaneously exchanged for the $1.375 million transfer of funds—the Trustee conflates two very different concepts, the value of the New Contracts, which have value in and of themselves, and the eventual revenues ESA would have received upon performance of the New Contracts. While the Trustee correctly points out that ESA did not receive the actual revenues under the New Contracts in contemporaneous exchange for the transfer to Hanover, the Trustee fails to recognize that the New Contracts had a value in and of themselves in excess of $1.375 million based on the record in this case. We find no clear error in the bankruptcy court's finding of fact that the flow of funds from Prospect to ESA to SunTrust (for Hanover) and the award of the New Contracts was in fact a "substantially contemporaneous exchange" of assets. The bankruptcy court's finding recognized the ordinary flow of a commercial transaction in obtaining a loan and conveying its proceeds to acquire a new asset, which in this case was the New Contracts. The bankruptcy court did not clearly err in concluding that ESA received the New Contracts in a substantially contemporaneous exchange for the transfer to Hanover.

The bankruptcy court therefore properly held that Hanover carried its burden to prove all the elements of the new value defense under § 547(c)(1) so as to bar the Trustee from avoiding the transfer of the $1.375 million to Hanover.[12]

---

[12]Hanover asserts that the bankruptcy court also ruled in its favor on separate equitable grounds. Because we affirm the bankruptcy court's

IV

Conclusion

Although the bankruptcy court erred in finding that the ear-marking defense applied in this case, we find no error in its determination that Hanover is entitled to the new value defense under § 547(c) to the Trustee's claim of a preferential transfer. We therefore affirm the judgment of the bankruptcy court awarding summary judgment to Hanover.

*AFFIRMED*

TRAXLER, Chief Judge, dissenting:

Because I believe Hanover was not entitled to summary judgment on its new-value defense, I respectfully dissent.

The Bankruptcy Code's preference section serves two goals. First, it prevents companies "from racing to the court-house to dismember the debtor during his slide into bankruptcy." *Harmon v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 487 (4th Cir. 1992) (internal quotation marks omitted). And second, it pro-

---

application of the new value defense, we address Hanover's equitable defense only to note that neither this court nor any other has recognized that such an equitable defense to a preference action exists. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.") Even the single case that Hanover cites to support its equitable grounds defense provides it no support. *See Kmart Corp. v. Uniden Am. Corp. (In re Kmart Corp.)*, 318 B.R. 409, 415 (Bankr. N.D. Ill. 2004) (holding that, apart from threshold defenses such as "lack of in personam jurisdiction, service of process, standing, and the like," "the enumerated 547(c) preference exceptions are the exclusive defenses to liability for an otherwise avoidable preferential transfer").

tects "equality of distribution among creditors." *Id.* (internal quotation marks omitted).

Section 547(c) provides exceptions for certain preferential transfers, the avoidance of which would not further the purposes of § 547(b). *See* 11 U.S.C. § 547(b), (c). Section 547(c)(1) provides that a transfer cannot be avoided "to the extent [it] was . . . intended by the debtor and the creditor to or for whose benefit [it] was made to be a contemporaneous exchange for *new value* given to the debtor; and [it was] in fact a substantially contemporaneous exchange." 11 U.S.C. § 547(c)(1) (emphasis added). The statute defines "new value," as is relevant here, as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee." 11 U.S.C. § 547(a)(2).

The purpose of the § 547(c)(1) exception is "to encourage creditors to continue to deal with troubled debtors without fear that they will have to disgorge payments received for value given." *Collier on Bankruptcy* ¶ 547.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012). As the legislative history demonstrates, § 547(c)(1) was intended to address the "generic problem that those on the verge of bankruptcy still need to buy things and the fact that checks are used (with a brief gap between purchase and payment) ought not render the payment avoidable as one made for an antecedent debt." *United Rentals, Inc. v. Angell*, 592 F.3d 525, 529 (4th Cir. 2010) (alterations and internal quotation marks omitted). "Protecting contemporaneous exchanges for new value from avoidance does not harm the preference section's goal of protecting the equality of distribution among the debtors because such exchanges do not diminish the size of the debtor's estate." *Id.*

The Trustee argues that "Hanover did not sustain its burden of establishing Hanover's contemporaneous exchange defense to the Trustee's $1.375 million preferential transfer claim."

Appellant's Brief at 55. The Trustee contends that even assuming that the New Contracts constituted new value, "Hanover failed to present evidence of the extent of the new value." *Id.* I agree.

As stated above, the statute defines "new value," as is relevant here, as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee." 11 U.S.C. § 547(a)(2). Under the New Contracts, ESA did not stand to receive any goods, services, new credit, or any release of property. It stood to receive only money. But as the Trustee points out, ESA never received any money under the New Contracts since ESA did not complete the work.

Hanover does not argue, and could not argue, that it presented evidence that the New Contracts were goods or services that could be sold for at least $1.375 million in the marketplace. Rather, Hanover contends that ESA received "new value" of at least $1.375 million in the form of the New Contracts because ESA expected to make that much profit by eventually completing its work under those contracts. *See* J.A. 584 (Cole affidavit). But regardless of what Hanover hoped to eventually receive, what it actually received was only a *conditional promise* to pay ESA money *at some point in the future*. Section 547, however, requires that the debtor's receipt of money, goods, services, new credit or property release be substantially contemporaneous with the debtor's payment.[1] *See In re Teligent, Inc.*, 315 B.R. 308, 317 (Bankr. S.D.N.Y. 2004) (explaining that "[a] promise of future services . . . does not constitute 'new value.'"); *cf. Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 204 (1988) (discussing

---

[1]Hanover also argues that the bonds themselves constituted new value of at least $1.375 million to ESA because the face value of the bonds exceeded that amount. However, the government, not ESA, was the beneficiary on the bonds. If Hanover proved any new value to ESA, it was limited to $74,071, the premium ESA paid for the bonds.

"new value" exception to absolute priority rule and stating that "[u]nlike 'money or money's worth,' a promise of future services cannot be exchanged in any market for something of value to the creditors *today*").

Indeed, the facts of this very case demonstrate why receipt of a conditional promise for payment at some indefinite future time does not constitute receipt of "new value" in the amount of the promised payment.[2] In a "new value" transaction, the debtor's payment does not reduce the size of the estate because the money paid by the debtor is replaced by money, goods, services, new credit, or property releases of equivalent value. *See Angell*, 592 F.3d at 529. Here, in contrast, Hanover successfully obtained $1.375 million from the estate without replacing it with equal value.[3] In so doing, Hanover jumped ahead of ESA's other unsecured creditors and received far more payment via the letter of credit than it otherwise could have received in bankruptcy. Thus, the bankruptcy court erred, in my view, in concluding that Hanover established the new-value defense.[4]

I therefore would reverse the district court order affirming the bankruptcy court.

---

[2]Cole's affidavit supports Hanover's factual premise that ESA expected to make a profit of more than $1.375 million by performing the work under the New Contracts, but it does not establish the legal conclusion ESA actually received at least $1.375 million in new value.

[3]ESA's unrealized expectation that it would profit at some point in the future under the New Contracts shows that the contracts may have had "value" in traditional business/commercial parlance. ESA's expectation did not replenish the estate, however, and thus the New Contracts did not amount to "new value" within the meaning of § 547(c).

[4]For the reasons stated in the majority opinion, I also believe the bankruptcy court erred in concluding that Hanover established the earmarking defense. *See ante* at 8-12. Additionally, I do not read the bankruptcy court order as ruling for Hanover on equitable grounds independent of the earmarking and new-value defenses.