**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-1621**

_____

SG HOMES ASSOCIATES, LP,

          Plaintiff - Appellee,

    v.

MICHAEL J. MARINUCCI,

          Defendant - Appellant.

_____

Appeal from the United States District Court for the District of
Maryland, at Baltimore.    William D. Quarles, Jr., District
Judge.  (1:11-cv-02517-WDQ; 10-11253; 10-00252)

_____

Argued: March 20, 2013                  Decided:  June 4, 2013

_____

Before GREGORY and AGEE, Circuit Judges, and David A. FABER,
Senior United States District Judge for the Southern District of
West Virginia, sitting by designation.

_____

Affirmed by published opinion.  Judge Agee wrote the opinion, in
which Judge Gregory and Senior Judge Faber joined.

_____

**ARGUED:** Jeffrey Louis Forman, KAUFFMAN & FORMAN, PA, Towson,
Maryland, for Appellant.  Steven B. Gould, BROWN & GOULD, LLP,
Bethesda, Maryland, for Appellee.  **ON BRIEF:** Bruce E. Kauffman,
KAUFFMAN & FORMAN, PA, Towson, Maryland, for Appellant.  Jesse
D. Stein, BROWN & GOULD, LLP, Bethesda, Maryland, for Appellee.

AGEE, Circuit Judge:

Defendant-Appellant Michael J. Marinucci ("Marinucci") appeals from the district court's order affirming the bankruptcy court's finding of fraud and entry of a nondischargeable judgment for Plaintiff-Appellee SG Homes Associates, LP ("SG Homes"). For the reasons that follow, we affirm the judgment of the district court.

I.

A.

Marinucci was the president and a 50% shareholder of Chesapeake Site Contracting, Inc. ("Chesapeake"). On December 20, 2007, Chesapeake responded to SG Homes' bid request for site work on a building project at Crabbs Branch Way in Montgomery County, Maryland ("Crabbs Branch Way project" or "the project").

Some time before December 28, 2007, Marinucci and Chesapeake's senior project manager, Jay Munnikhuysen ("Munnikhuysen"), met and discussed Chesapeake's bid with two SG Homes officials, procurement manager Paul DeVerger ("DeVerger") and procurement vice president Lorin Randall ("Randall"). Marinucci asked whether SG Homes would require a bond or accept a higher retainer instead. Although Randall agreed to consider a retainer, SG Homes ultimately required a bond.

2

On January 28, 2008, SG Homes awarded Chesapeake the work and requested a certificate of insurance, a performance bond, and a completed W-9 tax form. Although the parties had not signed a written contract, Chesapeake hired subcontractors and suppliers and began work on the Crabbs Branch Way project almost immediately.

On or before February 1, 2008, Marinucci completed a bond request form from the Atlantic Risk Management Corporation requesting performance and payment bonds. On February 1, 2008, Marinucci told Randall in an email that Chesapeake was "pursuing the performance and payment bonds as we agreed." (J.A. 167.) By mid-March 2008, however, Marinucci had decided not to obtain a bond because his wife would not sign a personal guaranty which the bonding companies required. Nonetheless, on March 26, 2008, Munnikhuysen copied Marinucci on an email to DeVerger that said, "Our office advises me that you should see the P&P bond by the end of next week." (J.A. 169.)

Work continued without a written contract, and Chesapeake submitted monthly payment applications to SG Homes. Each application contained a certification from Chesapeake that, "to the best of [Chesapeake's] knowledge, the work covered by [the] Application for Payment ha[d] been completed in accordance with the Contract Documents" and "all amounts previously paid to [Chesapeake] under the Contract ha[d] been used to pay

3

[Chesapeake's] costs for labor, materials, and other obligations." (See, e.g., J.A. 195.) Marinucci reviewed each application and directed an employee to sign the certification. Chesapeake deposited the payments received from SG Homes into a common fund from which it paid some of its subcontractors and suppliers on the project, but also paid other creditors who did not provide services or supplies for the Crabbs Branch Way project.

B.

On May 12, 2008, Chesapeake and SG Homes executed a written agreement ("the Contract") governing the project. The Contract was ambiguous about whether Chesapeake was required to obtain a bond. Subsection G, under "Payment Conditions," noted that all subcontractors were "subject to a 5[%] retainer and/or must post a bond guaranteeing satisfactory completion of the work." (J.A. 141; J.S.A. 29-30.) An "X" was placed next to both options indicating the Contract required a 5% retainer and a "warranty/completion" bond. (J.A. 141.)

Subsection M, Part (a) of the Contract ("Performance and Payment Bonds"), under "General Conditions," stated that Chesapeake would pay for and provide performance and payment bonds to SG Homes, unless a "box [was] checked and no bond [was] indicated above." (J.A. 145.) There was neither a box nor a

4

check next to this provision.  However, Part (b) of Subsection M stated that, if Chesapeake was not then required to post a bond or bonds, SG Homes could require a bond "at any time," at SG Homes' expense for the Crabbs Branch Way project.  (J.A. 145.)

Subsection L of the Contract, under "Payment Conditions," required Chesapeake to "insure that all subcontractors, employees, and suppliers, at all times [were] paid all amounts due in connection with the performance of [the] Contract," and submit evidence of payments.  (J.A. 141 (emphasis added).)  SG Homes was authorized to withhold any payments due Chesapeake should the subcontractors not be paid and was also authorized to pay such subcontractors directly.  Subsection H, under "General Conditions," required Chesapeake to keep the project free of liens.  (J.A. 144.)

Marinucci testified that he understood the Contract required Chesapeake to use the money from SG Homes to pay the subcontractors and suppliers working on the project.  (J.S.A. 121.)  Further, Marinucci affirmed that Chesapeake's contracts with the project's subcontractors and suppliers provided that Chesapeake would pay them when it was paid by SG Homes. Marinucci also testified that he knew about the Maryland Construction Trust Statute, which requires money disbursed to a contractor by a project's developer to be used only to pay that

5

project's subcontractors.  (J.S.A. 100-01); see Md. Code Ann., Real Prop., § 9-201.[1]

C.

On May 14, 2008, Munnikhuysen sent an email to DeVerger to say that Chesapeake's bond had been "cancelled because [Chesapeake] assumed that [SG Homes] no longer wanted it." (J.A. 171.)  DeVerger responded the same day, noting that "there may have been a communication breakdown" because SG Homes still needed a bond.  (J.A. 170.)  DeVerger asked how soon Chesapeake could obtain a bond, and at what cost, so that the Contract could be revised.  Munnikhuysen replied that he had "talked to [Marinucci] via telephone and [Chesapeake] [would] get on the bond right away."  (J.A. 170.)  On June 3, 2008, DeVerger emailed Munnikhuysen and asked when the bond would be issued. Munnikhuysen responded that he would "check again" and "let [DeVerger] know."  (J.A. 172-73.)  Marinucci was copied on every email in the exchange.

---

[1]  "Any moneys paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any subcontractor, shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials, or both, for or about the building, for purposes of paying those subcontractors."  Md. Code Ann., Real Prop., § 9-201(b)(1).

6

On June 17, 2008, Munnikhuysen sent DeVerger—and copied Marinucci—on an email with the subject line "Guardrail/bond—Crabbs Branch Way." (J.A. 174–75.) Munnikhuysen said that he had received DeVerger's telephone message and forwarded it to Marinucci, who was out of the office but "handling the issues [DeVerger] [had] called about." (J.A. 174–75.)

In September 2008, Randall emailed Marinucci to say that a subcontractor had told SG Homes that it had performed work for Chesapeake on the project in July 2008 but would not be paid until October 2008. Randall told Marinucci that he would "pay them directly and back the amount out of [Chesapeake's] next payment." (J.A. 178.) On October 9, 2008, Randall emailed Marinucci about another subcontractor that was owed money from Chesapeake on the project, and that a joint check would be issued to the subcontractor.

On October 29, 2008, Randall emailed Marinucci to inform him that other project subcontractors and suppliers had reported that they had not been paid by Chesapeake. Randall said that SG Homes would pay them directly "with funds due to Chesapeake." (J.A. 179.) After the suppliers and subcontractors were paid, however, SG Homes' "preliminary calculations" indicated that "no money [would] be due Chesapeake." (J.A. 179.) SG Homes subsequently terminated the Contract. (J.A. 179–82.)

In February 2009, SG Homes sued Chesapeake and Marinucci in Maryland state court for breach of contract, fraud, and violation of the Maryland Construction Trust Statute. While the case was pending in state court, Marinucci filed individually for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the District of Maryland. SG Homes was listed as a creditor of Marinucci based on any liability arising from the Crabbs Branch Way project. The state court stayed SG Homes' suit against Marinucci, pursuant to 11 U.S.C. § 362, but the case proceeded against Chesapeake.

In January 2010, the state court entered a default judgment against Chesapeake as to liability. Subsequently, the state court determined the amount of damages and entered a final judgment of $208,806.89 in favor of SG Homes on April 19, 2010.

Four days later, SG Homes filed an adversary proceeding against Marinucci in the bankruptcy court, seeking a declaration that Marinucci's debt to it was nondischargeable under 11 U.S.C. § 523(a)(2)(A). SG Homes contended that Marinucci had violated his fiduciary duties as a statutory trustee under the Maryland Construction Trust Statute. The Complaint alleged that Chesapeake had held money in trust for subcontractors, Marinucci had controlled that money, and he had knowingly withheld payment from the subcontractors, in violation of the statute. SG Homes

8

sought to recover $208,806.89, plus fees and costs from Marinucci as a nondischargeable debt.

On July 14, 2010, Marinucci moved for judgment on the pleadings. He argued that a violation of the Maryland Construction Trust Statute was not a valid basis for objecting to the discharge of his debt. SG Homes opposed the motion and moved to amend the complaint, seeking to add two new grounds for nondischargeability: fraud and subrogation.

On September 21, 2010, the bankruptcy court granted Marinucci's motion on the sole count of the original complaint, violation of the Maryland Construction Trust Statute. However, the bankruptcy court granted SG Homes' motion to add the fraud count, but denied the motion to add the proposed subrogation claim.

On July 13, 2011, the case went to trial solely on the fraud count, which SG Homes presented based on two separate theories of liability.[2] First, it asserted that Marinucci had falsely represented that Chesapeake would obtain a payment bond. Second, it alleged that Marinucci had falsely certified in the

---

[2] Marinucci argued that, because SG Homes had dismissed its fraud count against Chesapeake in state court, it was now barred from pursuing a derivative fraud claim against him. The bankruptcy court rejected Marinucci's argument, reasoning that the amended complaint alleged that Marinucci himself had made misrepresentations, and liability did not require a finding that Chesapeake had also committed fraud.

monthly payment applications that Chesapeake was paying its subcontractors and suppliers on the Crabbs Branch Way project from those funds.

At trial, the parties stipulated that SG Homes had paid $208,806.89 to subcontractors and suppliers of Chesapeake that had worked on the Crabbs Branch Way project but had not been paid by Chesapeake. Randall testified at trial and explained how he calculated the amount using invoices, balance sheets, and Chesapeake's payment applications. He also testified that, had he known in January or February 2008 that Chesapeake would not obtain a bond, SG Homes would not have awarded the contract to Chesapeake or allowed it to start work. He further testified that, had he known after execution of the Contract that Chesapeake would not obtain a bond or pay the subcontractors, SG Homes would have paid the subcontractors and suppliers directly, or made an arrangement to issue joint checks.

Marinucci testified that when SG Homes paid the subcontractors and suppliers, it owed Chesapeake $277,000. He presented no supporting exhibits, however, and conceded during cross-examination that he had not reviewed the invoices used in Randall's calculations. A spreadsheet of unpaid bills, created by Chesapeake, showed that the company owed $534,543.80 to its Crabbs Branch Way project subcontractors and suppliers in November 2008. (J.A. 232–37.)

10

The bankruptcy court made extensive findings of fact based on the trial evidence. These findings included that the parties had agreed that Chesapeake would obtain a bond that insured payment, and that Marinucci had misrepresented Chesapeake's intent to obtain the bond. The court also found from the "totality of the evidence," that the certifications at the bottom of each monthly payment application constituted a false representation that monies received from SG Homes were used to pay only subcontractors and suppliers connected to the Crabbs Branch Way project. (J.A. 66.)

> [T]he intent was to assure the owner that from monies received on this job, the subcontractors and material men and expenses of the job were being paid, it is the whole purpose of such certification, it is in the context of a draw request . . . . That was not a correct statement of fact at the bottom.
>
> Because what was happening without any dispute of fact is that all the funds received were going into a common account and being paid out for payables of Chesapeake without regard to which job and based upon decisions solely made by Mr. Marinucci who would indicate which payables were to be paid when money was available.

(J.A. 66-67.)

The bankruptcy court found that SG Homes had proven fraud by Marinucci on both of the theories presented and that SG Homes had relied on the fraudulent misrepresentations to its detriment. First, that Marinucci defrauded SG Homes by

11

intentionally failing to obtain a bond.  Second, that Marinucci intentionally misrepresented that he would use the funds received to pay the Crabbs Branch Way project subcontractors and suppliers.  The court specifically ruled in the alternative, finding each ground as an independent basis for judgment against Marinucci for fraud, the amount of damages, and the nondischargeability of the debt.

The bankruptcy court found that the damages Marinucci owed SG Homes were $208,806.89, the amount SG Homes had "double" paid the subcontractors and suppliers.  (J.A. 70.)  Crediting SG Homes' evidence over Marinucci's "unsupported testimony," the court found that "there was an ultimate deficit on this job" after SG Homes had paid the subcontractors and suppliers.  (J.A. 70.)  The court stated it "must conclude that as a result of either of the two frauds incurred that SG [Homes] has been damaged in the amount requested," $208,806.89.  (J.A. 70.)

The bankruptcy court further determined that the judgment debt was nondischargeable under 11 U.S.C. § 523(a)(2)(A), which disallows the discharge of a debt obtained by fraud.  The court reasoned that Marinucci had drawn a $150,000 salary from Chesapeake and

> [w]ithout revenue[,] the company would fail,
> [and] when the company failed[,] the salary
> would stop.   When  the  company  .  .  .
> fail[ed,]  the  investment,  the  50  percent
> ownership interest[,] would go from whatever

12

> value it may have had to zero and it did ultimately. . . . although Mr. Marinucci did not get a check directly . . . he did get money and an enhancement of value of property as a result of his personal fraud so [11 U.S.C. §] 523(a)(2) does apply.

(J.A. 74–75.)

Marinucci appealed the bankruptcy court's decision to the United States District Court for the District of Maryland, arguing that the adversary proceeding should have been dismissed because the state court judgment collaterally estopped SG Homes from suing him in bankruptcy court. Alternatively, he argued that the bankruptcy court erred in awarding SG Homes a nondischargeable judgment because SG Homes had failed to establish fraud. SG Homes cross-appealed the bankruptcy court's dismissal of its original complaint based on the Maryland Construction Trust Statute.

The district court affirmed the bankruptcy court's findings of fraud, damages, and entry of nondischargeable judgment for SG Homes.[3] The court declined to address the merits of SG Homes' cross-appeal, reasoning that the "alleged error [would] have no adverse consequence if the Court affirms the judgment in [SG Homes'] favor." (J.A. 106.)

---

[3] The district court also rejected Marinucci's collateral estoppel argument which he does not raise as an issue in this appeal.

13

Marinucci timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 158(d)(1).

II.

A.

Where, as here, a district court acts as a bankruptcy appellate court, "our review of [its] decision is plenary." Bowers v. Atlanta Motor Speedway, Inc. (In re Se. Hotel Props. Ltd. P'ship), 99 F.3d 151, 154 (4th Cir. 1996). In such a circumstance, "we review the bankruptcy court's decision independently." Banks v. Sallie Mae Servicing Corp. (In re Banks), 299 F.3d 296, 300 (4th Cir. 2002). Thus, we review for clear error the findings of fact made by the bankruptcy court, and we assess de novo its conclusions of law. Kielisch v. Educ. Credit Mgmt. Corp., 258 F.3d 315, 319 (4th Cir. 2001).

B.

Under the Bankruptcy Code, a debtor is entitled to the discharge of his debt obligations at the conclusion of Chapter 7 bankruptcy proceedings, absent the application of a statutory exception. See 11 U.S.C. § 523(a) (identifying nineteen statutory exceptions to discharge). In these proceedings, SG Homes objected to the discharge of Marinucci's debt under 11 U.S.C. § 523(a)(2)(A), which disallows the discharge of a debt

14

obtained by fraud.[4] A plaintiff's proof of fraud under subsection (2)(A) requires satisfaction of the elements of common law fraud: "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages." Nunnery v. Rountree (In re Rountree), 478 F.3d 215, 218 (4th Cir. 2007); Gourdine v. Crews, 955 A.2d 769, 791 (Md. 2008); see also Field v. Mans, 516 U.S. 59, 69 (1995) (explaining that "operative terms" of subsection (2)(A) are "common-law terms").

On appeal, Marinucci contends that the bankruptcy court erred in entering a nondischargeable judgment against him because SG Homes failed to prove two of the elements of fraud: reliance and damages. Both elements require proof of facts, and the bankruptcy court's findings of fact may not be set aside on appeal unless they are clearly erroneous. Kielish, 258 F.3d at 319. As explained below, the bankruptcy court did not clearly err in finding that SG Homes justifiably relied on Marinucci's fraudulent misrepresentations, and thereby suffered proven damages.

---

[4] Subsection (2)(A) of § 523(a) provides that Chapter 7 bankruptcy does not discharge a debtor from any debt obligation obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition."

15

III.

A.

We turn first to the bankruptcy court's finding that SG Homes was justified in relying on Marinucci's false certifications in the monthly payment applications that Chesapeake was paying its subcontractors and suppliers.[5] Marinucci contends that this finding was clear error because the applications required Chesapeake to certify only that it used SG Homes' money to pay any of Chesapeake's subcontractors and suppliers, not that the funds be used to pay only vendors providing services or supplies to the Crabbs Branch Way project.

To satisfy the justifiable reliance element in proof of fraud, a plaintiff must show that it actually relied on the debtor's misrepresentations, and was justified in doing so because of "the circumstances of the particular case." Field, 516 U.S. at 71. A plaintiff "is justified in relying on a representation . . . although he might have ascertained the falsity of the representation had he made an investigation." Id. at 70 (quoting Restatement (Second) of Torts § 540 (1976));

---

[5] As noted earlier, the bankruptcy court ruled in favor of SG Homes on two independent and alternate grounds of nondischargeable fraud: the bond misrepresentation and the subcontractor payment misrepresentation. The district court agreed. As we affirm on the basis of the subcontractor payment misrepresentation, it is unnecessary for us to address the bond fraud. See Campbell v. Hanover Ins. Co. (In re ESA Envtl. Specialists, Inc.), 709 F.3d 388, 399 n.11 (4th Cir. 2013).

16

see also Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 135 (4th Cir. 1999) (characterizing justifiable reliance as a "minimal standard").

The bankruptcy court's finding that SG Homes justifiably relied on Marinucci's false certifications in the payment applications was not clearly erroneous because it was solidly based on the trial evidence. As the court recognized, the parties' intent and the plain language of the Contract, which must be read in conjunction with the certifications, required Chesapeake to use the money from SG Homes to pay only the subcontractors and suppliers working on the Crabbs Branch Way project. See Ray v. William G. Eurice & Bros., Inc., 93 A.2d 272, 279 (Md. 1952) ("[W]here a writing refers to another document[,] that other document, or so much of it as is referred to, is to be interpreted as part of the writing.") (cited in Wells v. Chevy Chase Bank, F.S.B., 832 A.2d 812, 831 (Md. 2003)). The certifications in the applications stated that SG Homes' payments to Chesapeake had been made "in accordance with the Contract Documents," and "all amounts previously paid to [Chesapeake] under the Contract ha[d] been used to pay [Chesapeake's] costs for labor, materials, and other obligations." (See, e.g., J.A. 195.) Indeed, the Contract provided that Chesapeake had to pay all subcontractors and suppliers "all amounts due in connection with the performance of

17

[the] Contract." (J.A. 141 (emphasis added).) Importantly, Marinucci testified he understood that when Chesapeake received payments from SG Homes, Chesapeake was to use that money to pay the subcontractors who worked on the Crabbs Branch Way project:

> [Gould]: And so when you agreed on behalf of Chesapeake under Subsection L that at all times Chesapeake would pay all amounts due in connection with the performance of the contract, you understood that you are promising SG Homes that you were going to honor your agreements with your subcontractors, correct?
>
> [Marinucci]: As long as they honor their agreements with me, correct.
>
> [Gould]: Right, and that meant that when you got paid by SG Homes you would then turn around and pay the subcontractors who had agreements like we went over that they would get paid when paid, right?
>
> [Marinucci]: Yes.

(J.S.A. 121.) Marinucci further testified that Chesapeake's contracts with its subcontractors and suppliers promised payment only after it received the funds from SG Homes. Additionally, Marinucci testified that he was familiar with the Maryland Construction Trust Statute, which expressly requires funds received by a contractor to be used only to pay subcontractors on that job. See Md. Code Ann., Real Prop. § 9-201(b)(1) ("Any moneys paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any

18

subcontractor, shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials, or both, for or about the building, for purposes of paying those subcontractors."); see also Hearn v. Hearn, 936 A.2d 400, 406 (Md. Ct. Spec. App. 2007) ("Parties to a contract are presumed to contract mindful of the existing law, and all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident.").

In these circumstances, the bankruptcy court was entitled to find—as it did—that SG Homes justifiably relied on Marinucci's false certifications in the monthly payment applications that Chesapeake was paying its Crabbs Branch Way project subcontractors and suppliers. Otherwise, SG Homes would not have continued to pay Chesapeake had it known Chesapeake was making false certifications, but would have paid the subcontractors directly. As a result, the bankruptcy court's finding of fraud on the basis of justifiable reliance was not clearly erroneous.

B.

We turn next to the bankruptcy court's finding that, as a result of Marinucci's fraud, SG Homes incurred $208,806.89 in damages, the amount SG Homes "double" paid for work completed

19

and material furnished by Chesapeake's subcontractors and suppliers. (J.A. 70.) Marinucci challenges the bankruptcy court's award of damages, maintaining that the court erred because SG Homes owed Chesapeake $277,000 for services already provided, and SG Homes' decision to instead use that money to pay Chesapeake's subcontractors and suppliers directly does not yield any net damages to SG Homes. In effect, Marinucci contends that the $208,806.89 paid to subcontractors and suppliers was merely an offset of the $277,000 he contends SG Homes owed Chesapeake.

Under Maryland law, "[i]t is the general rule that one may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the natural, proximate and direct effect of the injury." Empire Realty Co. v. Fleisher, 305 A.2d 144, 147 (Md. 1973). In determining the "proper measure of damages in fraud and deceit cases," Maryland applies the "flexibility theory," under which a victim of fraudulent misrepresentation may elect to recover either out-of-pocket expenses or benefit-of-the-bargain damages. Hinkle v. Rockville Motor Co., 278 A.2d 42, 47 (Md. 1971). The former permits a plaintiff to recover his or her actual losses; the latter puts the plaintiff in the same financial position as if the fraudulent representation had in fact been true. Goldstein v. Miles, 859 A.2d 313, 324 (Md. Ct. Spec. App. 2004); see also

20

Buie v. Sys. Automation Corp., 918 F.2d 955 (table), 1990 WL 180126, at *11 (4th Cir. 1990) (benefit-of-the-bargain damages may be employed only in "appropriate cases"). In this case, SG Homes recovered out-of-pocket expenses.[6]

Following a bench trial, the bankruptcy court determined that, as a result of Marinucci's fraud, SG Homes paid twice for work completed and material furnished by Chesapeake's subcontractors and suppliers:

> The evidence as pointed to by [SG Homes] is that SG [Homes] paid the draw request for work after the date of the contract, performed by Chesapeake and invoiced by Chesapeake. Chesapeake did not pay the subs and material men for some if not all of the work included in those invoices, liens were threatened and/or imposed and SG [Homes] had to pay out again directly to the subs and material men for the same work and supplies.

(J.A. 68–69.) The court found that the exact amount of such double payment was $208,806.89, which was supported by the following evidence offered by SG Homes: (1) Marinucci stipulated that SG Homes paid $208,806.89 to the subcontractors and suppliers; and (2) Randall testified and explained in detail how he calculated that figure using invoices, balance sheets, and

---

[6] We note that no legal error influenced the bankruptcy court's damages calculation, as SG Homes was entitled to recover its out-of-pocket expenses rather than benefit-of-the-bargain damages. See Hinkle, 278 A.2d at 47 (adopting "flexibility theory"). We thus review the bankruptcy court's damages calculation for clear error. Univ. Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 427 (4th Cir. 2010).

21

Chesapeake's payment applications. The court further found Marinucci's argument that SG Homes owed Chesapeake funds in excess of the amount of the double payment to be unsupported by the evidence:

> The Court finds most probative of this not the pretty much unsupported testimony of Mr. Marinucci but the exhibit about which I colloquy counsel for [SG Homes] during closing argument.
>
> The spreadsheet furnished by Chesapeake about the status of its accounts on this job in which it appears that according to that exhibit . . . there was an ultimate deficit on this job and that therefore there was not a fund to recoup the double payment.

(J.A. 70.) Chesapeake's spreadsheet showed that it still owed more than $534,000 to its Crabbs Branch Way project subcontractors and suppliers in November 2008. Importantly, the court noted that Marinucci conceded he had not reviewed the invoices used in Randall's calculations, and also had not provided any documentary support for his assertion that Chesapeake was owed $277,000.

The bankruptcy court thus properly determined that Marinucci had failed to rebut SG Homes' prima facie proof of damages. The court appropriately required SG Homes to establish its actual losses and then shifted the burden to Marinucci to prove any offset or reduction to that amount by any funds SG Homes still owed Chesapeake for services already provided.

22

Moreover, we discern no clear error in the court's conclusion that Marinucci failed to meet this burden. Marinucci was given an opportunity to offer reliable proof in support of his argument, yet failed to do so. In short, Marinucci's case in rebuttal to SG Homes' prima facie case of damages was his unsupported testimony which the bankruptcy court found not credible. In other words, Marinucci simply failed to carry his burden of proof.

The bankruptcy court's comprehensive findings were based on its examination of the parties' presentations and on the credibility of witnesses, particularly the unsupported testimony of Marinucci. See Parris v. Lynch, 35 F.3d 556 (table), 1994 WL 486549, at *1 (4th Cir. 1994) ("assessing the weight of evidence and the credibility of witnesses is within the sole province of the fact-finder"). These factual findings are entitled to our deference. As a result, the court's award of damages for SG Homes was not clearly erroneous.

Finally, we conclude that the bankruptcy court did not err in determining that the judgment debt was nondischargeable under 11 U.S.C. § 523(a)(2)(A), which disallows the discharge of a debt obtained by fraud. SG Homes obtained a judgment based on Marinucci's fraud after having shown the fraud, reliance on the fraud, and damages attributable to the fraud. Section 523(a)(2)(A) was, therefore, the appropriate exception to

23

discharge in bankruptcy for SG Homes' judgment claim against Marinucci.

## IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.